No. _____

IN THE

# United States District Court for the District of Maryland

———————

*In re* CHRISTINA BOSTICK

———————

*To the Honorable Paul W. Grimm,*
*United States District Judge:*

———————

**EMERGENCY APPLICATION TO JUSTICE SOTOMAYOR FOR AN EXTRAORDINARY WRIT OF MANDAMUS AND/OR INJUNCTION AND TEMPORARY RESTRAINING ORDER AS TO MASS IDENTITY THEFT IN CONJUNCTION WITH DELETERIOUS ELECTIONEERING COMMUNICATIONS MADE VIA COVERT COMMUNICATION CHANNELS AND REQUEST FOR WAIVER OF SECURITY**

September 30, 2022

Christina J. Bostick
9520 Berger Road
Ste. 212
Columbia, MD 21044
(443) 832-3259

*Pro Se* Litigant

## Preface

This case was originally intended to be filed in the United States Supreme Court ("Supreme Court") because several are the Parties named as Defendants in this action are States, generating original jurisdiction in the Supreme Court.  However, on or about September 27, 2022,  I sent this Emergency Application to the Supreme Court my United States Postal Office Priority Mail with tracking only to discover that it was considered delivered, but was not actually delivered to the Supreme Court, but was intercepted by an unknown person never to have arrived at the Supreme Court at all.  *See* **Exhibit 1**.  Since no one at the Supreme Court Public Information Office or the Clerk's Office would assist with locating the lost filing, despite the emergent nature of it, I am filing the action in this Court (which also has jurisdiction) without modification and with the expectation that it be properly removed to the Supreme Court as originally intended.

## Question Presented

Although the facts of this case may read as outrageous or, perhaps put more succinctly, as if to represent a piece of science fiction, the renowned author and science professor Isaac Asimov once said, "[s]cience fiction writers foresee the inevitable, and although problems and catastrophes may be inevitable, solutions are not." I therefore offer the following questions in light of the facts and (unanticipatedly) seek a solution from this Honorable Court:

1. Where Defendants rely on the opinion issued in *Citizens United v. Federal Election Com'n* (the "*Citizens United Opinion*" or the "*Opinion*") in order to establish a Covert Communication Channel that imprisons an individual, as well as that individual's consciousness and, as a result, said individual is thereby deprived of her free will, range of

2

motion, health, and/or financial security and on an ongoing bases, Defendants purport to be depriving her as such because they are engaged in an electioneering communication, express advocacy, and/or are operating as slave masters as to her, do such circumstances and conditions present an extraordinarily pressing need for immediate equitable relief, warranting Federal, Judicial intervention into a State-based activity.   175 L.Ed.2d 753 (2010).

2.     Where colluding institutions in Government, Business, Academia, and Medicine – each with their own independently determined objective – intentionally create and/or deliberately permit a Covert Communication Channel to occur which traps an individual within a secret, isolated field of communications without her consent and, as such,  the circumstances of created as a result of that CCC continue on indefinitely and with impunity despite repeated notice that the experience is torturous, do the actions of such institutions amount to a deprivation of one's Constitutional rights in such a way as to have caused irreparable harm and an extraordinarily pressing need for immediate equitable relief, warranting Federal and Judicial intervention into a State-based activity.

3.     Where both the action and nonaction of State officials (including those in the State's judicial system) and/or other persons with the actual power, influence, and/or ability to take corrective action, have resulted in irreparable injury to Plaintiffs, do the circumstances derived therefrom amount to extraordinary circumstances such that they render participating institutions (particularly State courts) incapable of fairly and fully adjudicating the issues before them, requiring that the deference typically afforded to the State by the Federal government be relaxed to afford Plaintiffs appropriate injunctive relief.

4.     Whether Defendants characterized Plaintiffs' experience within the CCC as "slavery" and/or as a "slavery game" flagrantly and/or patently violates express Constitutional prohibitions such that immediate Federal intervention is warranted and/or the relief requested herein must be granted.

5.     Whether permitting the participation of citizens of another sovereign nation as *additional* "slave masters," namely citizens of the United Kingdom who are also members of the British royal family, creates an extraordinarily pressing need for immediate equitable relief and warrant Federal and Judicial intervention into a State-based activity and/or foreign activity.

6.     Whether, under conditions as described above, forcing one to smoke, drink, starve, to be prohibited from taking her child to daycare, inundating her residence with mold, and denying her a form of transportation, among other imposed conditions creates an extraordinarily pressing need for immediate equitable relief, warranting Federal and Judicial intervention into a State-based activity.

7.     Whether an extraordinarily pressing need for immediate equitable relief that warrants Federal and Judicial intervention into a State-based activity is created where Defendants are actively engaged in a "slavery game" whereby they have enslaved at least one (1) individual and have admitted to holding hundreds of other isolated individuals in slavery globally, under the threat of death if they were to ever reveal the that they were forced to submit to such conditions, and further that they coordinated as several *sovereign* states in order to succeed from the Union.

# EMERGENCY APPLICATION[1]

### Thoughts on the Divine Will.

The will of God prevails.  In great contests each party claims to act in accordance with the will of God.  Both *may* be and one *must* be wrong.  God can not be *for*, and *against* the same thing at the same time.  In the present civil war it is quite possible that God's purpose is something different from the purpose of either party—and yet the human instrumentalities, working just as they do, are of the best adaptation to effect His purpose.  I am almost ready to say this is probably true—that God wills this contest, and wills that it shall not [have] end[ed] yet.  By His mere quiet power, on the minds of the now contestants, he could have either *saved* or *destroyed* the Union without a human contest.  Yet the contest began.  And having begun, He could give the final victor to either side any day.  Yet [now] the contest proceeds [at the United States Supreme Court].

-ABRAHAM LINCOLN (CA. SEPTEMBER 1862)

## I.  INTRODUCTION

It was not my intent to end up here—filing these papers with this, the Highest Court in the land—and yet, it does seem appropriate to do so.  Over the course of the last twelve (12) years of my life, I have dealt with circumstances of such an extreme nature that I could never have imagined them possible.  Still, I must presently face the reality that I *am* in such a contest as the one described by President Lincoln in the thoughts set forth herein above.

On Thursday, December 13, 2007, Citizens United filed its original Verified Complaint for Declaratory and Injunctive Relief.  On December 21, 2007, it filed an Amended version of that Complaint wherein, as-applied, it challenged the constitutionality

---

[1] Generally, this Application shall be amended to include various sections that were excluded due the urgent nature of the request.  Such amendments shall include a table of contents, table of authorities, and certificate of service; the amended version will be filed as soon as possible following the initial filing of this Application.

of the Disclosure of Electioneering Communications section of the  Bipartisan Campaign Reform Act of 2002 as to the newly implemented requirements in its § 201 whereby all electioneering communications must be reported and as to § 311 whereby such electioneering communications must contain disclaimers (the "Disclosure Requirements"). *See* **Exhibit A**, at 1.  As the bases for its challenge, Citizens United claimed that it intended to publish advertisements and broadcast a movie that would meet the statutory definition of an electioneering communication, but that the intended film, *Hillary: The Movie* (the "*Hillary*"), did not properly fall under that definition and should, therefore, not be held accountable as to the Disclosure Requirements.  *See id.*  By March of 2009, the case worked its way to the Supreme Court for argument.  On January 21, 2010, the Court issued its opinion, ruling 5-4 (with the Honorable Justice Clarence Thomas, dissenting in part) that both the §§ 201 and 311 Disclosure Requirements applied to *Hillary*.  *See Citizens United v. Federal Election Com'n*, 175 L.Ed.2d 753 (2010).

 Despite its ruling, the Supreme Court also decided that *McConnell* was an appropriate time to reanalyze "the continuing effect of speech suppression" it deemed to be the result of one of the Court's 2003 opinions.  *See McConnell v. Federal Election Com'n*, 540 U.S. 93, 203-209 (2003).  To that end, the Honorable Justice Anthony M. Kennedy ("Justice Kennedy") refused the opposing argument that the Court could not take up speech suppression because Citizens United had already waived the claim, having stipulated to dismiss its earlier filed facial challenge.[2]  *See Citizens United v. Federal Election Com'n*, 175 L.Ed.2d 753, 880 (2010).  Citizens United Justice Kennedy further stated that the lower court had passed

---

[2] Persons participating in the communication at the time this sentence was written by yelling.

upon the issue and that, because it did so, the Court could rightfully discuss it in connection with the *Citizens United* action.

In *McConnell*, the Court upheld limits on electioneering communications which prohibited political speech on the bases of the speaker's corporate identity. *See generally id.* Now, the Citizens United Court would overrule its early decision by:

1. Determining that not taking up the issue of political speech suppression would have the effect of chilling political speech;

2.  Overruling *Austin* on the bases that it provided no basis for allowing the government to limit corporate independent expenditures;

3. Overruling the Disclosure Requirements; and,

4. Concluding that independent expenditures including those made by corporations do not give rise to corruption, nor the appearance of corruption despite noting that speech is *the* (sole) means by which citizens can hold officials accountable.

As such, Citizens United was free to circulate *Hillary*.  However, the purported nonprofit film production company went much further than a single film and vastly exceed the limited scope of Justice Kennedy's Opinion.  Rather, Citizens United and its affiliates, partners and/or members conspired to cast Plaintiff Christina J. Bostick as a walking, talking, breathing reality show to be filmed from the inside out instead of the outside in.  In other words, as soon as the Opinion issued and Ms. Bostick graduated from Georgetown Law School a few months later, she was loaded with electric technology and connected with remote systems where at least 49,999 persons (per state) had daily access to her based on pay-per-view subscriptions. *See Citizens United*, 175 L.Ed.2d 753, 887 (2010).  In what was once a highly debated and often dismissed theory, such direct network access to an

individual comports with the theory of Predictive Programming—the theory that *fictional* movies or books are being used to prepare the masses to easily accept without fuss future planned events that may otherwise shock their conscience—allowing the producers to effectuate Ms. Bostick's life in such a way as to please the audience and cruelly effect the entirety of her career and post-academic citizenship by making her a come-to-life version of the *Truman Show*.



In fact, Lampson Network Covert Channel technology Lampson and designed to transmit secret messages between multiple individuals without the communication being noticed by

the observer.  *See* **Exhibit B**, at 3.  In his article, Tian presents the following illustration regarding its operation:

> The classic communication scenario of the covert channel is the prisoner problem: Alice and Bob are held in two rooms of a prison.  They want to escape, and they need to transmit the escape plan to each other, but the watcher Wendy monitors them.  Therefore, Alice and Bob need to complete the information exchange without alerting Wendy. With the development of Internet, the network covert channel has emerged. . . . The goal of network covert channels is not only to ensure that communication content is not discovered but also to protect the identities of both parties.

*See id.*  By relying on such technology there exists a constant, persistent attempt to control Ms. Bostick's life with the intent to reduce her to a  point of total failure such that the audience can laugh, cry, be in awe, or tremble with anxiety as she daily attempts to overcome the unauthorized virtual network access into her head, all over her office, as well as her home.  Further, the majority of Howard County, Maryland is involved and participating in the CCC in a concerted attempt to bring Ms. Bostick to ruin, particularly since there are public announcements secretly playing on a county-wide speaker system which can be heard by any person with a subscription but which she is prevented from hearing herself.  The extent of Defendants' collective involvement is clearly significant; in relation to that speaker system, Defendants forced her to move to an area where they installed a loud blaring horn which comes on each time an announcement is made such that Ms. Bostick never hears any announcement made there upon.

Furthermore, there is a constant hack into my computer as evident by the repetitive bridge communication that I consistently end as an ongoing and/or running application, but which is repeatedly resumed by one or more of the Defendants named as parties to this

action.  *See* **Exhibit C.**  Defendants use what is labeled a "Bridge Communication" in order to deliberately prevent me from working in my independent legal practice by deleting, retrieving, manipulating, and preventing my access to various documents and/or applications, including the internet.  *See id*.  More recently, Defendants used their access into my computer in effort to prevent me from completing and filing this motion.

In carrying out these violent, intrusive, conspired, acts against Plaintiffs Ms. Bostick and her minor son, Defendants have not only trampled upon my constitutionally protected right as discussed in greater depth herein, but they have used me as an opportunity to test whether their covert technology can be effectively used in order to return to a social order which required black persons to be enslaved as chattel.  In order to so, they relied on The Willie Lynch Letter (the "Lynch Letter") whereby persons interested in *making* a slave are instructed as follows:

> Let us make a slave.  What do we need?  First of all we need a black nigger man, a pregnant nigger woman and her baby nigger boy.  Second, we will use the same basic principle that we use in breaking a horse, combined with some more sustaining factors.  We reduce them from their natural state in nature; whereas nature provides them with the natural capacity to take care of their needs and the needs of their offspring, we break that natural string of independence from them and thereby create dependency stat so that we maybe (*sic*) able to get from them useful production of our business and pleasure.

*See* **Exhibit D**, at 1.  After reviewing the full extent of the text, they implemented the instructions as to Plaintiff Ms. Bostick and her son.  Now, on an ongoing basis, Defendants attempt to carry out these instructions as a means of enslaving Plaintiffs and controlling both their behavior and circumstances.

Among the named Defendants is the McArthur Fellowship who, for some time, has relied upon CCC technology in order to determine potential persons to whom they would award a $650,000 scholarship.  *See* **Exhibit E**.  At some point, Defendant McArthur Fellowship accessed Ms. Bostick using Defendants' covert technology and she was considered and selected to receive that scholarship; however, Defendant McArthur Fellowship either recklessly or willfully permitted its co-Defendants with access to her and allowed those co-Defendants to abuse and torture her while it carried on with administering its Fellowship, ultimately denying her access to funds she had already been selected to receive.  As a result, Defendants could carry on with slavery while simultaneously hacking at her for creative and scientific ideas to steal and profit off of as if it had been their own work product.

Additionally, there are several states named as Defendants hereto that relied upon the *Citizens United Opinion* in order to participate in making Plaintiff and her minor son a reality show, as well as a test case for a technological future rooted in a slavery system.  In conspiring with the various business entities and individuals also hereto named as Defendants, Defendants intended to and did effectuate a succession from the Union such that they now exist as a confederacy.  Thus, I bring this action, requesting that an investigation immediately ensue on the bases of it and, further, to insist that the responsible parties not only be forced to terminate their slavery-based relationship with Plaintiff, but that both she and her family be fully compensated for the real, actual, and putative damages which certainly derive from their collective indifference to our humanity.

## II.   PARTIES TO PROCEEDING

The list below is intended to brief the Court as to the identities of both the Plaintiffs and the Defendants named as parties to this action.  However, a more in-depth description of the relevant Parties is attached hereto as **Exhibit F**.  Pursuant to Federal Rule of Civil Procedure 17, each party named herein possesses the requisite capacity to sue. Additionally, according to each respective person and/or entity identified below; each qualifies as a "real party in interest."[3]

### PLAINTIFFS

### Bostick & Associates Business and Legal Consulting Group, LLC
(heretofore referred to as "*B&A Consulting*")

        Responsible Officer/Contact   :  Christina J. Bostick, Man. Dir
        Geographic Location of Party  :  Columbia, Maryland, USA

### Christina J. Bostick
(heretofore referred to as "*Miss Bostick*")

        Geographic Location of Party  :  Columbia, Maryland, USA

### C.B.T, *a minor*
(by his next of kin:  Miss Bostick)

        Responsible Officer/Contact   :  Christina J. Bostick, Mother
        Geographic Location of Party  :  Columbia, Maryland, USA

### Goody Two Shoes, Inc.
(heretofore referred to as "*Goody Two*")

        Responsible Officer/Contact   :  Christina J. Bostick, Creative Dir.
        Geographic Location of Party  :  Columbia, Maryland, USA

---

[3] Given the emergent nature of this Application, Plaintiffs' Certificate of Service, and the Service List as to Defendants will follow in the days immediately following the filing of the Application.

**The Law Office of Christina J. Bostick, LLC**

(heretofore referred to as "*Bostick Law*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Christina J. Bostick, Man. Dir. |
| Geographic Location of Party | : | Columbia, Maryland, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
|  |  | (b) in its Capacity as Clients 1-400 |

**Nunc Pro Tunc, Incorporated**

(heretofore referred to as "*NPT*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Christina J. Bostick, Chair, Bd. of Dir. |
| Geographic Location of Party | : | Columbia, Maryland, USA |

**Pretty Girls Rock Global, LLC**

(heretofore referred to as "*Pretty Girls*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Christina J. Bostick, Man. Dir. |
| Geographic Location of Party | : | Columbia, Maryland, USA |

**Pretty Girls Rock Investments, LLC**

(heretofore referred to as "*Rock Invest.*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Christina J. Bostick, Man. Dir. |
| Geographic Location of Party | : | Columbia, Maryland, USA |

<div align="center">

**DEFENDANTS**

</div>

**Academy of Motion Picture Arts and Sciences**

(heretofore referred to as the "*Academy*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Whoopi Goldberg, Govn'r. |
| Geographic Location of Party | : | Beverly Hills, California, USA |

**Adobe**

(heretofore referred to as the "*Academy*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Whoopi Goldberg, Govn'r. |
| Geographic Location of Party | : | Beverly Hills, California, USA |

**Affinipay, LLC**

-and-

**MyCase, Inc.**

(heretofore referred to as the "*Affinipay*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Amy Porter, Fndr. and Exec. Chwm. |
| Geographic Location of Party | : | Austin, Texas, USA |

**Albertsons Companies, Inc.**

(heretofore referred to as "*Brand*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Vivek Sankaran, President and CEO |
| Geographic Location of Party | : | Boise, Idaho, USA |
| Capacity Assigned to Party | : | (a) in its Individual capacity |
|  |  | (b) in its Individual capacity as Safeway, Inc. |
|  |  | (c) in its Individual capacity as Better Living Brands, LLC |

**The Allstate Corporation**

(heretofore referred to as "*Allstate*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Thomas J. Wilson, C.E.O |
| Geographic Location of Party | : | Northbrook, Illinois, USA |

**Alphabet, Inc.**
  -and/or-
**Google, Inc.**

(heretofore referred to as "*Google*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Sundar Pichai, Chief Exec. Dir. |
| Geographic Location of Party | : | Columbia, Maryland, USA |

**Alpha Kappa Alpha Sorority, Incorporated**

(heretofore referred to as "*AKA*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Danette Anthony Reed, C.E.O |
| Geographic Location of Party | : | Chicago, Illinois, USA |
| Capacity Assigned to Party | : | (a) Individual/Personal; |
|  |  | (b) *as to* member Ashley Patterson |
|  |  | (c) *as to* member Jamie Jackson |
|  |  | (d) *as to* member Michelle Obama |
|  |  | (e) *as to* member Kamala Harris |

**Altice USA, Inc.**

(heretofore referred to as "*Altice*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Dexter Goei, C.E.O |
| Geographic Location of Party | : | West Long Island City, New York,  USA |
| Trade Names | : | (a) Cablevision |
|  |  | (b) CSC Holdings, LLC |

**Apple (iCloud) Inc**

(heretofore referred to as "*(iCloud)*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Tim Cook, President |
| Geographic Location of Party | : | Los Angeles, CA, USA |

Apple (iCloud) Inc (5016641)

**American Civil Liberties Union Foundation, Inc.**
  -and-
**American Civil Liberties Union, Inc.**

(heretofore referred to as "*ACLU*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Anthony D. Romero, Exec. Dir. |
| Geographic Location of Party | : | New York, New York USA |

**The State of Arizona**

(heretofore referred to as "*Arizona*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Doug Doucey, Govn'r. |
| Geographic Location of Party | : | Phoenix, AZ, USA |

**The Association of American Universities**

(heretofore referred to as "*AAU*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Barbara R. Snyder, President |
| Geographic Location of Party | : | The District of Columbia, USA |

**The City of Atlanta**

(heretofore referred to as "*Atlanta*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Andre Dickens, Mayor |
| Geographic Location of Party | : | Atlanta, Georgia, USA |

**AT&T Corporation**

(heretofore referred to as "*ATT*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | William E. Kennard, Chair, Bd of Dir. |
| Geographic Location of Party | : | New York, New York, USA |

**Baker, Donelson, Bearman, Caldwell & Berkowitz, A Professional Corporation**

(heretofore referred to as "*Ober Kaler*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Timothy M. Lupinacci, Chmn. and CEO |
| Geographic Location of Party | : | Memphis, TN, USA |

**Ballard Spahr LLP**

(heretofore referred to as "*Ballard Spahr*")

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Mark S. Steward, Chair of the Firm |
| Geographic Location of Party | : | Philadelphia, Pennsylvania USA |
| Capacity Assigned to Party | : | (a) Limited Liability Partnership |
|  |  | (b) Limited Liability General Partnership |
|  |  | (c) General Partnership |

## Behr Process Corporation
(heretofore referred to as *"Behr"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Jeff Filley, President and C.E.O. |
| Geographic Location of Party | : | Santa Ana, California, USA |
| Capacity Assigned to Party | : | (a) In its Individual capacity |
|  |  | (b) In Jeff Filley's individual capacity |
|  |  | (c) In Jeff Filley's official capcity |

## Blumhouse Holdings LLC
(heretofore referred to as *"Blumhouse"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Caroline Asfoon Raufi, General Counsel |
| Geographic Location of Party | : | Sherman Oaks, California, USA |

## David N. Bossie
(heretofore referred to as *"Bossie"*)

|  |  |  |
|---|---|---|
| Geographic Location of Party | : | The District of Columbia, USA |
| Capacity Assigned to Party[4] | : | (a) Individual/Personal |
|  |  | (b) President of Citizens United |
|  |  | (c) Chairman of Citizens United |
|  |  | (d) Committeeman |

## BP P.L.C.
(heretofore referred to as *"BP"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Helge Lund, Chair |
| Geographic Location of Party | : | St. James's Square, London, England |

## Mike Buescher
(heretofore referred to as *"M. Buescher"*)

|  |  |  |
|---|---|---|
| Geographic Location of Party | : | Ellicott City, Maryland, USA |
| Capacity Assigned to Party | : | in his personal capacity and in his capacity as Mike Buescher Photography |

## Megan Buescher-Conner[5]
(heretofore referred to as *"Buescher"*)

|  |  |  |
|---|---|---|
| Geographic Location of Party | : | Ellicott City, Maryland, USA |

---

[4] As to the capacity in which this action is brought against Bossie, he shall respond *in his personal capacity* and in his capacity as President and Chairman of Citizens United, Citizens United Foundation, Citizens United Productions, and any of its affiliates as well as in his capacity as Republican National Committeeman for the State of Maryland.

[5] By extension of Buescher, who resides at 11055 Gaithers Farm Road in Ellicott City, Maryland, any and all other residents at that location shall also be included as a party to this action, pending discovery.

## The State of California
(heretofore referred to as *"California" or "Newson"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Gavin Newson, Govn'r. |
| Geographic Location of Party | : Sacramento, California, USA |

## Shawn Carter
(heretofore respectively referred to as *"Jay-Z"*)

|  |  |
|---|---|
| Geographic Location of Party | : New York, New York, USA |
| Capacity Assigned to Party | : (a) Individual/Personal |
|  | (b) Official re: Rock Nation, LLC, including any and all subsidiary or affiliate companies. |

## Beyoncé Knowles-Carter
(heretofore referred to as *"Beyoncé"*)

|  |  |
|---|---|
| Geographic Location of Party | : New York, New York, USA |
| Capacity Assigned to Party | : (a) Individual/Personal |
|  | (b) Official re: Rock Nation, LLC, including any and all subsidiary or affiliate companies. |

## Residents of Clarksville, Maryland and The Village of River Hill
(heretofore referred to as *"Clarksville Neighbors"* or *"River Hill"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Renée DuBois, Village Manager |
| Geographic Location of Party | : Clarksville, Maryland, USA |

## Citizens United
(heretofore referred to as (*"Citizens United"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Michael Boos, VP and Gen. Counsel |
| Geographic Location of Party | : The District of Columbia, USA |
| Capacity Assigned to Party | : Collectively with any of its affiliates. |

## The State of Colorado
(heretofore referred to as (*"Colorado"} or ("Polis"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Jared Polis, Governor |
| Geographic Location of Party | : Denver, CO, USA |

## Comcast Corporation
(heretofore referred to as *"(Comcast"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Kenneth J. Bacon, Dir. |
| Geographic Location of Party | : Philadelphia, Pennsylvania, USA |
| Capacity Assigned to Party | : Collectively with any of its affiliates. |

**The State of Connecticut**
(heretofore referred to as *"Connecticut" or "Lamont"*)

   Responsible Officer/Contact  : Ned Lamont, Govn'r
   Geographic Location of Party : Hartford, Connecticut, USA

**Consilio, LLC**
(heretofore referred to as *"Special Counsel"*)

   Responsible Officer/Contact  : Andy MacDonald, CEO
   Geographic Location of Party : The District of Columbia, USA

**Dar Al Taqwa Incorporated** dba **Dar Al-Taqwa Islamic Center**
(heretofore referred to as the *"Islamic Center"*)

   Responsible Officer/Contact  : Yehia Hassanein, President
   Geographic Location of Party : Ellicott City, Maryland, USA

**The State of Delaware**
(heretofore referred to as *"Deleware" or "Carney"*)

   Responsible Officer/Contact  : John Carney, Govn'r.
   Geographic Location of Party : Wilmington, Delaware, USA

**Dell, Inc.**
(heretofore referred to as *"Dell"*)

   Responsible Officer/Contact  : Michael S. Dell, C.E.O.
   Geographic Location of Party : Round Rock, Texas, USA
   Capacity Assigned to Party  : (a) Collectively with any of its affiliates
                (b) In its Individual Capacity
                (c) In Michael S. Dell's individual
                   capacity
                (d) In Michael S. Dell's official capacity

**Delta Delta Delta Fraternity, Incorporated**
(heretofore referred to as *"Delta Fraternity"*)

   Responsible Officer/Contact  : Karen Hughes White, CEO
   Geographic Location of Party : Chicago, Illinois, USA

**D.H. Redmond & Associates, Inc.** *dba* **Carolina Tobacco Company**
(heretofore referred to as *"Carolina Tobacco"*)

   Responsible Officer/Contact  : David H. Redmond, President
   Geographic Location of Party : Portland, Oregon, USA

## Earthstar Press

(heretofore referred to as *"Earthstar"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Hamid Akhavan, CEO |
| Geographic Location of Party | : East Englewood, Colorado, USA |

## Echostar Broadcasting Corporation

(heretofore referred to as *"Echostar"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Ann Ulrich Miller, CEO |
| Geographic Location of Party | : Eckert, Colorado, USA |

## Rahm Emanuel, United States Ambassador to Japan

(heretofore referred to as *"Amb. Emanuel"*)

|  |  |
|---|---|
| Geographic Location of Party | : The District of Columbia, USA |
| Capacity Assigned to Party | : In his individual capacity only. |

## Euronext Amsterdam N.V.

(heretofore referred to as *"Euronext"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Stéphane Boujnah, CEO |
| Geographic Location of Party | : Amsterdam, Netherlands, USA |

## Federal Broadcasting Corporation

(heretofore referred to as *"Fed. Broadcasting Corp."*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Christopher Wray, Dir. |
| Geographic Location of Party | : The District of Columbia, USA |

## Future Systems International, Inc.

(heretofore referred to as *"FSII"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Meena Bishnoi, Agnt. |
| Geographic Location of Party | : Columbia, Maryland, USA |

## The State of Georgia

(heretofore referred to as *"Georgia" or "Kemp"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Brian Kemp, Govn'r. |
| Geographic Location of Party | : Atlanta, Georgia, USA |

## Georgetown University Law Center

(heretofore referred to as *"Georgetown"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : William Treanor, Dean |
| Geographic Location of Party | : The District of Columbia, USA |

## Goodbye Pictures

(heretofore referred to as *"Goodbye Pic"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Rich Bye, President |
| Geographic Location of Party | : Los Angeles, California, USA |

## Grace Communion International aka the Worldwide Church of God

(heretofore referred to as *"Grace" or the "WWCG"*)

|                              |   |                                    |
|------------------------------|---|------------------------------------|
| Responsible Officer/Contact  | : | Joseph Tkach, Chmn.                |
| Geographic Location of Party | : | Charlotte, North Carolina, USA     |

## Grand Chapter of Delta Sigma Theta Sorority, Incorporated
*dba* Delta Sigma Theta

(heretofore referred to as *"DST"*)

|                              |   |                                        |
|------------------------------|---|----------------------------------------|
| Responsible Officer/Contact  | : | Dorcas Washington, Exec. Dir. (*Acting*) |
| Geographic Location of Party | : | The District of Columbia, USA          |
| Capacity Assigned to Party   | : | (a) In its Individual capacity         |
|                              |   | (b) *as to* member Ashley Anderson Martin |
|                              |   | (c) *as to* member Jocelyn R. Cuttino  |
|                              |   | (d) *as to* member Ouleye N'doye       |
|                              |   | (e) *as to* member April Winstead      |
|                              |   | (f) *as to* Columbia (MD) Alumnae Chapter |

## Half Yard Productions, LLC

(heretofore referred to as *"Half Yard"*)

|                              |   |                               |
|------------------------------|---|-------------------------------|
| Responsible Officer/Contact  | : | Dirk Hoogstra, CEO            |
| Geographic Location of Party | : | New York, New York, USA       |

## Hampton University

(heretofore referred to as *"Hampton"*)

|                              |   |                                   |
|------------------------------|---|-----------------------------------|
| Responsible Officer/Contact  | : | Darrell K. Williams, President    |
| Geographic Location of Party | : | Hampton, Virginia, USA            |

## Hasbro, Inc.

(heretofore referred to as *"Hasbro"*)

|                              |   |                                       |
|------------------------------|---|---------------------------------------|
| Responsible Officer/Contact  | : | Richard S. Stoddart, Chair of the Bd. |
| Geographic Location of Party | : | Pawtucket, Rhode Island, USA          |

## Henkel Corporation

(heretofore referred to as *"Henkel"*)

|                              |   |                                     |
|------------------------------|---|-------------------------------------|
| Responsible Officer/Contact  | : | Carsten Knobel, C.E.O and President |
| Geographic Location of Party | : | Rocky Hill, Connecticut, USA        |

## City of Hampton

(heretofore referred to as *"Hampton, VA"*)

|                              |   |                               |
|------------------------------|---|-------------------------------|
| Responsible Officer/Contact  | : | Donnie Tuck, Mayor           |
| Geographic Location of Party | : | Hampton, Virginia, USA        |

## Hewlett-Packard Company
(heretofore referred to as *"HP"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Chip Bergh, Chair of the Bd. of Dir. |
| Geographic Location of Party | : Palo Alto, California, USA |

## Home Depot USA, Inc.
(heretofore referred to as *"Home Depot"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Craig Menear, Chair of the Bd. of Dir. |
| Geographic Location of Party | : Atlanta, Georgia, USA |

## Howard County, Maryland
(heretofore referred to as *"Howard County"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Calvin B. Ball, III, Ed. D., Cnty. Exec. |
| Geographic Location of Party | : Ellicott City, Maryland, USA |
| Capacity Assigned to Party | : At each level of gov't or gov'tal entity. |

## I AM PART OF *dba* DIVINE
(heretofore referred to as *"DIVINE"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Shukrat Ibagimov, Chair |
| Geographic Location of Party | : Hereford, United Kingdom |

## The State of Illinois
(heretofore referred to as *"Illinois"* or *"Pritzker"* )

|  |  |
|---|---|
| Responsible Officer/Contact | : J.B. Pritzker, Govn'r. |
| Geographic Location of Party | : Springfield, California, USA |

## The Johns Hopkins University
(heretofore referred to as *"JHU"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : William Louis J. Foster, Chair of the Bd. |
| Geographic Location of Party | : Baltimore, Maryland, USA |

## The State of Idaho
(heretofore referred to as *"Idaho"* or *"Little"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Brad Little, Govn'r |
| Geographic Location of Party | : Boise, Idaho, USA |

## Kristina Joyner-Leslie
(heretofore referred to as *"Joyner"*)

|  |  |
|---|---|
| Geographic Location of Party | : Arlington, VA, USA |

**Kappa Alpha Psi Fraternity, Inc.**

(heretofore referred to as *"Kappa Fraternity"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Reuben Shelton III, Esq., Gd. Polemarch |
| Geographic Location of Party | : | Philadelphia, Indiana, USA |
| Capacity Assigned to Party | : | (a) Individual |
|   |   | (b) as to Pi Chapter |
|   |   | (c) as to member Milton Dodson |

**Klingbeil Capital Management, LTD**., *an Ohio Limited Liability Company*

(heretofore referred to as *"Klingbeil LLC"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | James H. Callard, Exec. VP |
| Geographic Location of Party | : | Columbus, Ohio, USA |

**KMF XI Ashton Green**

(heretofore referred to as *"KMF XI"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Michael Wheet, Property Manager |
| Geographic Location of Party | : | Columbia, Maryland, USA |

**Learning Care Group, Inc.**

(heretofore referred to as *"Childtime"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Mark R. Bierly, CEO |
| Geographic Location of Party | : | East Lansing, Michigan, USA |

**Lionsgate Entertainment Corporation, Inc.**

(heretofore referred to as *"Lionsgate"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Mignon Clyburn, Mmbr. of the Bd. of Dir. |
| Geographic Location of Party | : | Santa Monica, California, USA |

**John D. and Catherine T. MacArthur Foundation**

(heretofore referred to as *"MacArthur Foundation"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Stephanie Bell-Rose, Mbr., Bd. of Dir. |
| Geographic Location of Party | : | Chicago, Illinois, USA |

**Manor Hill Farm, LLC**

(heretofore referred to as the *"Farm"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Randolph Marriner, Agnt. |
| Geographic Location of Party | : | Ellicott City, Maryland, USA |

**The State of Maryland**

(heretofore referred to as *"Maryland"* or *"Hogan"*)

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Larry Hogan, Govn'r |
| Geographic Location of Party | : | Baltimore, Maryland, USA |
| Capacity Assigned to Party | : | At each level of gov't or gov'tal entity. |

**Maryland State Bar Association**

(heretofore referred to as "*MSBA*")

        Responsible Officer/Contact  :  Victor L. Velazquez, Agnt.

        Geographic Location of Party  :  Baltimore, Maryland, USA

**Mattel, Inc.**

(heretofore referred to as "*Mattel*")

        Responsible Officer/Contact  :  Ynon Kreiz, Chairman and C.E.O.

        Geographic Location of Party  :  Segundo, California, USA

**Marvel**

(heretofore referred to as "*McDonald's*")

        Responsible Officer/Contact  :  Christopher Kempczinski, President

        Geographic Location of Party  :  Chicago, Illinois, USA

**McDonald's Corporation**

(heretofore referred to as "*McDonald's*")

        Responsible Officer/Contact  :  Christopher Kempczinski, President

        Geographic Location of Party  :  Chicago, Illinois, USA

**MGM Television Entertainment, Inc.**

(heretofore referred to as "*MGM*")

        Responsible Officer/Contact  :  Rola Bauer, Pres.

        Geographic Location of Party  :  Wilmington, Delaware, USA

**Michaels Stores, Inc.**

(heretofore referred to as "*Michaels*")

        Responsible Officer/Contact  :  Ashely Buchanan, C.E.O.

        Geographic Location of Party  :  Irving, Texas, USA

**Microsoft Corporation**

(heretofore referred to as "*Microsoft*")

        Responsible Officer/Contact  :  Christopher Young, Exec. VP

        Geographic Location of Party  :  Tumwater, Washington, USA

**Mt. Pisgah A.M.E. Church**

(heretofore referred to as "*Mt. Pisgah*")

        Responsible Officer/Contact :  Rev. C. Michele Langston

        Geographic Location of Party  :  Columbia, Maryland, USA

**National Academy of Television Arts and Sciences**

(heretofore referred to as the "*Academy of TV*")

        Responsible Officer/Contact  :  Donn Johnson, Nat'l Trustee

        Geographic Location of Party  :  Chula Vista, California, USA

## National Association for the Advancement of Colored People
(heretofore referred to as "*NAACP*")

| | | |
|---|---|---|
| Responsible Officer/Contact | : | Karen Boykin-Towns, VC, Bd. of Dir. |
| Geographic Location of Party | : | Baltimore, Maryland, USA |
| Capacity Assigned to Party | : | (a) in its Individual capacity |
| | | (b) in its capacity as the Howard County, Maryland Chapter. |

## National Amusements, Inc.
(heretofore referred to as "*National Amusements*")

| | | |
|---|---|---|
| Responsible Officer/Contact | : | Shari Ellin Redstone, President |
| Geographic Location of Party | : | Timonium, Maryland, USA |
| Capacity Assigned to Party | : | (a) in its Individual capacity |
| | | (b) in its capacity as CBS Broadcasting, Inc. |
| | | (c) in its capacity as individual employee or contractor Vic Carter |
| | | (d) in its capacity as Paramount Global |
| | | (e) in its capacity as individual employee or contractor Sarah Steele |

## National Association of Space and Aeronautics
(heretofore referred to as "*NASA*")

| | | |
|---|---|---|
| Responsible Officer/Contact | : | Bill Nelson, Admin. |
| Geographic Location of Party | : | The District of Columbia, USA |

## National Pan-Hellenic Council
(heretofore referred to as the "*Pan-Hell*")

| | | |
|---|---|---|
| Responsible Officer/Contact | : | Willie Green, Agnt. |
| Geographic Location of Party | : | Grovetown, Georgia, USA |

## NBCUniversal Media, LLC
(heretofore referred to as "*NBC*")

| | | |
|---|---|---|
| Responsible Officer/Contact | : | Steve Burke, Chmn. |
| Geographic Location of Party | : | New York, New York, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
| | | (b) in its capacity as the Bravo Network |
| | | (c) in its capacity as the Real Housewives Franchise |
| | | (d) in the Professional capacity as each individual housewife, and in each individual housewife's personal capacity |

## The State of New York
(heretofore referred to as *"New York" or "Hochul"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Kathy Hochul, Gov'r. |
| Geographic Location of Party | : | New York, New York, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
|  |  | (b) in its specific capacity as New York City |
|  |  | (c) in its specific capacity as New York University |
|  |  | (d) at each other level of gov't or gov'tal entity. |

## Ouleye N'doye
(heretofore referred to as *"N'doye"*)

|  |  |  |
|---|---|---|
| Geographic Location of Party | : | Atlanta, Georgia 30316 |

## Netflix, Inc.
(heretofore referred to as *"Netflix"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Reed Hastings, Founder and co-C.E.O |
| Geographic Location of Party | : | Los Gatos, California, USA |

## Nintendo Co. Ltd. *dba* Nintendo of America Inc.
(heretofore referred to as *"Nintendo"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Shuntaro Furukawa, Rep. Dir. and Pres. |
| Geographic Location of Party | : | Redmond, Washington, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
|  |  | (b) in its capacity as both Nintendo Co. Ltd. and Nintendo of America Inc. |
|  |  | (c) in its capacity as Minoru Arakawa ("Arakawa") and in Arakawa's official and personal capacity. |
|  |  | (d) in the official and individual capacities of each of the members of its Board of Directors. |

## The State of North Carolina
(heretofore referred to as *"North Carolina" or "Cooper"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Roy Cooper, Govn'r. |
| Geographic Location of Party | : | The District of Columbia, USA |
| Capacity Assigned to Party | : | (e) in its Individual Capacity |
|  |  | (f) at each other level of gov't or gov'tal entity. |

**The State of Ohio**

(heretofore referred to as *"Ohio" or "Dewine"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Mike Dewine, Govn'r. |
| Geographic Location of Party | : The District of Columbia, USA |
| Capacity Assigned to Party | : (a) in its Individual Capacity |
|  | (b) at each other level of gov't or gov'tal entity. |

**Oracle Corporation**

(heretofore referred to as *"Oracle"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Larry Ellison, Chmn. of the Bd. of Dir. |
| Geographic Location of Party | : Austin, Texas, USA |

**Alexis Phifer**

(heretofore referred to as *"Phifer"*)

|  |  |
|---|---|
| Geographic Location of Party | : Beverly Hills, California, USA |

**The PNC Financial Services Group, Inc.**

(heretofore referred to as *"PNC"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Marjorie Cheshire, Mbr. of the Bd. of Dir. |
| Geographic Location of Party | : Pittsburgh, Pennsylvania, USA |

**Purveyors of Pop Productions, Inc.**

(heretofore referred to as *"Pop"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Steven Shapiro, Agnt. |
| Geographic Location of Party | : Woodland Hills, California, USA |

**The Pew Charitable Trusts**

(heretofore referred to as *"Pew"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Susan K. Uhran, President and CEO |
| Geographic Location of Party | : Philadelphia, Pennsylvania, USA |

**Shaunte Preer**

(heretofore referred to as *"Preer"*)

|  |  |
|---|---|
| Responsible Officer/Contact | : Steven Shapiro, Agnt. |
| Geographic Location of Party | : Silver Spring, Maryland, USA |

**Sukmeke Rainey[6]**

(heretofore referred to as *"Rainey"*)

|  |  |
|---|---|
| Geographic Location of Party | : Sherman Oaks, California, USA |

---

[6] *See* SUKMEKE RAINEY, *Footnotes for Kanye*, including various Rainey admissions as to the allegations raised herein, available at https://www.youtube.com/watch?v=zpXnaAUXhqg.

## Rasha

|  |  |
|---|---|
| Responsible Officer/Contact | : Hamid Akhavan, CEO |
| Geographic Location of Party | : East Englewood, Colorado, USA |

## The Republican National Committee
(heretofore referred to as "*RNC*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Ronna McDaniel, Chwn. |
| Geographic Location of Party | : The District of Columbia, USA |

## Ring, LLC
(heretofore referred to as "*Ring*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Jamie Siminoff, Fndr. |
| Geographic Location of Party | : Seattle, Washington, USA |

## Shapiro Internet Venture, Inc.
(heretofore referred to as "*Shapiro*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Norman Shapiro, Owner/Operator |
| Geographic Location of Party | : Chicago, Illinois, USA |

## Shapiro Venture Partners
(heretofore referred to as "*Venture Partners*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Danny Shapiro, Founder and Principal |
| Geographic Location of Party | : San Francisco, California, USA |

## Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
(heretofore referred to as "*Shulman Rogers*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Samuel M. Spiritos, Man. Shareholder |
| Geographic Location of Party | : Potomac, Maryland, USA |

## Skycasters, LLC
(heretofore referred to as "*Skycasters*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Tina Carl, Agnt. |
| Geographic Location of Party | : Canton, Ohio, USA |

## The State of South Carolina
(heretofore referred to as "*South Carolina*" or "*McMaster*")

|  |  |
|---|---|
| Responsible Officer/Contact | : Henry McMaster, Govn'r. |
| Geographic Location of Party | : Columbia, South Carolina, USA |
| Capacity Assigned to Party | : (a) in its Individual Capacity |
|  | (b) at each other level of gov't or gov'tal entity. |

**Spelman College**

(heretofore referred to as *"Spelman"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Mary Schmidt Campbell, President |
| | | Dawn Alston, C.F.O. |
| Geographic Location of Party | : | Atlanta, Georgia, USA |

**Staples Inc.**

(heretofore referred to as *"Staples"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | John A. Lederer, Exec. Chmn. of the Bd. |
| Geographic Location of Party | : | Framingham, Massachusetts, USA |

**The Supreme Court of Virginia**

(heretofore referred to as the *"Virginia Judiciary"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | The Honorable S. Bernard Goodwyn, Chief Justice |
| Geographic Location of Party | : | Richmond, Virginia, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
| | | (b) in its capacity as the Virginia Bar |
| | | (c) at each other level of gov't or gov'tal entity within the agency. |

**Target Corporation**

(heretofore referred to as the *"Target"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Brian Cornell, C.E.O. |
| Geographic Location of Party | : | Minneapolis, Minnesota, USA |

**The State of Texas**

(heretofore referred to as *"Texas"* or *"Abbott"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Greg Abbott, Govn'r |
| Geographic Location of Party | : | Woodland Hills, California, USA |
| Capacity Assigned to Party | : | (a) in its Individual Capacity |
| | | (b) at each other level of gov't or gov'tal entity. |

**Thomas Jefferson Foundation, Inc.**

(heretofore referred to as *"Thomas Jefferson"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Leslie Greene Bowman, President |
| Geographic Location of Party | : | Charlottesville, Virginia, USA |

**Thomas Jefferson National Accelerator Facility**

(heretofore referred to as *"Jefferson Accelerator"*)

|  |  |  |
|---|---|---|
| Responsible Officer/Contact | : | Stuart Henderson, Dir. |
| Geographic Location of Party | : | Glen Allen, Virginia, USA |

**Venus Thomas**
(heretofore referred to as *"Venus"*)
<div style="margin-left:2em">

      Geographic Location of Party  :  Waldorf, Maryland, USA
</div>

**Trinity School, Inc.**
_____
(heretofore referred to as *"Trinity"*)
      Responsible Officer/Contact  :  Greg Nichols
      Geographic Location of Party  :  Ellicott City, Maryland, USA

**Truly Adventurous, Inc.**
_____
(heretofore referred to as *"Truly Adventurous"*)
      Responsible Officer/Contact  :  Jon Housman, C.E.O.
      Geographic Location of Party  :  Marina Del Rey, California, USA

**Tyler Perry**
_____
(heretofore referred to as *"Perry"*)
      Responsible Officer/Contact  :  Tyler Perry, C.E.O.
      Geographic Location of Party  :  Atlanta, Georgia, USA
      Capacity Assigned to Party  :  (a) in its Individual Capacity
                                (b) in his Individual Capacity as Tyler Perry
                                (c) in his Official Capacity as C.E.O.

**The State of Virginia**
_____
(heretofore referred to as *"Virginia"* or *"Youngkin"*)
      Responsible Officer/Contact  :  Glenn Youngkin, Govn'r.
      Geographic Location of Party  :  Richmond, Virginia, USA
      Capacity Assigned to Party  :  (a) in its Individual Capacity
                                (b) at each other level of gov't or gov'tal entity.

**Virginia Company of London LTD**
_____
(heretofore referred to as the *"Virginia Company"*)
      Responsible Officer/Contact  :  John Wesley, Advocate
      Geographic Location of Party  :  Ruislip, London, United Kingdom
      Capacity Assigned to Party  :  (a) in its Individual Capacity
                                (b) at each other level of gov't or gov'tal entity.

**The University of Virginia**
_____
(heretofore referred to as *"UVA"*)
      Responsible Officer/Contact  :  James E. Ryan, President
      Geographic Location of Party  :  Charlottesville, Virginia, USA

## Viasat, Inc.

(heretofore referred to as "*Viasat*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Mark Dankberg, Chmn. |
| Geographic Location of Party | : | El Camino Real Carlsbad, CA, USA |

## The Walt Disney Company

(heretofore referred to as "*Disney Co.*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | LaTondra Newton, Senior V.P. |
| Geographic Location of Party | : | Burbank, California, USA |

## Warner Bros. Discovery

(heretofore referred to as "*Discovery*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Samuel A. Di Piazza, Jr., Bd. Chair |
| Geographic Location of Party | : | New York, New York, USA |

## The State of Washington

(heretofore referred to as "*Washington*" or "*Inslee*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Jay Inslee, Govn'r |
| Geographic Location of Party | : | Olympia, Washington, USA |

## Washington Adventist Hospital, Incorporated and Adventist Healthcare, Inc.

(heretofore referred to as "*Seventh-Day Adventist Hospital*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Terry Forde, President and C.E.O. |
| Geographic Location of Party | : | Takoma Park, Maryland, USA |
| Capacity Assigned to Party | : | (a) in their Individual Capacities |
|  |  | (b) in the Terry Forde's Individual Capacity |
|  |  | (c) in Terry Forde's Official Capacity |

## The Woodbridge Company

(heretofore referred to as "*Thompson-Reuters*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | John Zianis, President and CEO |
| Geographic Location of Party | : | Ontario, Canada |

## Weigel Broadcasting Co.

(heretofore referred to as "*Broadcasting Co.*")

|   |   |   |
|---|---|---|
| Responsible Officer/Contact | : | Norman Shapiro, President |
| Geographic Location of Party | : | Chicago, Illinois, USA |

## Matthew Hoffman Weiner

(heretofore referred to as "*Weiner*")

|   |   |   |
|---|---|---|
| Geographic Location of Party | : | Olympia, Washington, USA |

<u>Yale University</u>

(heretofore referred to as "*Verizon*")

> Responsible Officer/Contact : Peter Salovey, President
> Geographic Location of Party : Los Angeles, California, USA

## III.  CORPORATE DISCLOSURE STATEMENT

Plaintiffs hereby incorporate their Joint Corporate Disclosure Statement, filed contemporaneously herewith.

## IV.  JURISDICTION

Pursuant to Article III of the Constitution of the United States of America, original jurisdiction is properly situated in the United States Supreme Court (the "Supreme Court") because various States are named as Defendants hereto.  Article III states,

> In all Cases . . . in which a State shall be a Party, the Supreme Court shall have original jurisdiction.

*See also* U.S.C. § 1251; and the Eleventh Amendment of the United States Constitution.

## V.  CONSTITUTIONAL PROVISIONS RELIED UPON

This case involves the following United States' Constitutional provisions and their respective equivalents as to the provisions delineated in each of relevant state constitution:

- The Preamble

- Article I (Legislative Powers): Sections 2, 8, 9, and 10

- Article II (Executive Powers):  Sections 1, 2, and 3

- Article III (Judicial Powers):  1, 2, and 3

- Article IV (Powers and Rights Concerning the States):  Sections 1, 2, and 4

- Article VI (Supremacy)

- The First Amendment (Rights and Freedoms)

- The Second Amendment (A Well-Regulated Militia)

- The Third Amendment (The Housing of Soldiers)

- The Fourth Amendment (Unreasonable Searches and Seizures)

- The Fifth Amendment (Due Process)

- The Sixth Amendment (Right to a Speedy Trial)

- The Seventh Amendment (Trial by Jury)

- The Eighth Amendment (Excessive Bail)

- The Ninth Amendment (Rights Retained by the People)

- The Eleventh Amendment (Sovereign Immunity)

- The Twelfth Amendment (Election Procedures)

- The Thirteenth Amendment (Prohibition on Slavery)

- The Fourteenth Amendment (Equal Rights)

- The Fifteenth Amendment (Voting Rights Based on Race)

- The Nineteenth Amendment (Voting Rights Based on Gender)

- The Twentieth Amendment (Terms of Office)

- The Twenty-Second Amendment (Presidential Term Limitations)

- The Twenty-Fourth Amendment (Poll Taxes Prohibited)

- The Twenty-Sixth Amendment (Voting Rights Based on Age)

*See* **Exhibit F**.

## VI.  STANDARD OF REVIEW

### A.  Original Jurisdiction

Pursuant to Article III, Section Two (2) of the Constitution of the United States of America (the "U.S. Constitution"), "[i]n all Cases . . . in which a State shall be a Party, the

Supreme Court shall have original jurisdiction.  The Supreme Court's original jurisdiction is conferred to it solely by the U.S. Constitution, rather than through Congressional legislation.  *See California v. Arizona*, 440 U.S. 59, 65 (U.S.,1979).  Where original jurisdiction arises directly from the Constitution, such jurisdiction is self-executing and requires no legislative implementation at all.  *See id.*  Generally, the Constitutional grant of original jurisdiction is limited to cases which involve the States, among other limited situations and circumstances.  *See id.*  Whereas here, a case is brought against multiple defendants which include several States named as parties to the action, the Supreme Court's original jurisdiction falls in line with the intent and purpose of the Framers who were concerned with matching the dignity of the parties to the status of the case.  *See id.*  Thus, actions brought against any of the several States, must be resolved in the highest court of the land; elimination of such original jurisdiction would require the intended sovereign States to seek intervention from another courts in derogation of the Constitutional clauses which prohibit inferior courts from making determinations as to them.  *See id.*  Therefore, the Supreme Court does not possess the power to limit the original jurisdiction conferred on it by the Constitution for any reason.  *See id.*

If the Supreme Court were to be able to dispossess itself of original jurisdiction, it would look to (1) the nature of the interest of the State(s) made party to the action and (2) the seriousness and dignity of the claim.  *See Mississippi v. Louisiana*, 113 S.Ct. 549, 552–53, 506 U.S. 73, 77 (U.S. Miss.,1992).  In weighing such factors, the Court would first determine if the dispute involving the State(s) was of such a serious nature that it would amount to *casus belli* if the relevant State(s) maintained complete sovereignty.  *See id.*  Secondly, it would explore the availability of an alternative forum in which

the issue tendered could be resolved.  *See id.*  Here, Plaintiffs allege that the several States violated a plethora of Constitutional provisions by engaging in a collective "slavery game," not the least of which includes Article I, Section Ten's prohibition on States entering into a "Treaty, Alliance, or Confederation" and the Thirteenth (13th) Amendment's prohibition on slavery.  As such, and given the history of this Nation, this dispute undoubtedly rises to a *casus belli* and meets the requisite level of seriousness which would require this Court's intervention.  Furthermore, given the involved States' incompetence, ignorance, corruption and completely unjustified actions, no alternative forum is available such that the case could potentially be resolved elsewhere.   Rather, the corruption is so pervasive and all-encompassing that even the lower federal courts could be prejudicially impacted by the mass coercion employed in order to coordinate participation in the State-to-State "slavery game."

### B.  Jurisdiction to Enter a Preliminary Injunction

In order to secure a preliminary injunction, a plaintiff must show (1) a likelihood of success on the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; (4) reasonable diligence; and (5) that an injunction is in the public interest.  *See Benisek v. Lamone,* 138 S.Ct. 1942, 1943–45 (U.S.Md., 2018).

<u>Likelihood of Success on the Merits</u>.  Plaintiffs are likely to succeed on the merits of this action.[7]

<u>Likeliness to Suffer Irreparable Harm</u>.  The immediate Motion regards serious matters of import which include allegations of hostile, abusive, freedom-restricting, sexually violating circumstances which, without immediate Court intervention, have

---

[7] *See* Plaintiffs Motion for Leave to File a Complaint which shall be filed in the days immediately following the filing of this Application.

and will continue to lead to irreparable harm suffered by Plaintiffs, including eliminating their Constitutional rights as citizens and denying them common dignities afforded to all citizens, not the least of which are "Life, Liberty, and the Pursuit of Happiness" according to their "separate and equal Station."[8]

Balance of Equities.  The extremity of Plaintiffs' conditions, including that she is the subject matter of the "slavery game," far outweigh any potential argument that any of the named defendants would suffer a hardship in the issuance of a preliminary injunction or otherwise in their respective attempts to defend against this action.[9]

Reasonable Diligence.  This Motion is written under conditions of extreme duress, not the least of which include:

· Constant, unrelenting direct communication;

· Intentionally non-self-imposed sleep deprivation;

· Forced impoverished living conditions with the intent to have Plaintiffs evicted their my personal possessions put on the street;

· Intended starvation; and

· Extreme delay tactics.

See **Exhibit H**.  As a result of such tactics, as of 4:00 p.m. on July 16, 2022, for the last 496 hours, 22 minutes, and 30 seconds (more than 20 days, discounting time to sleep in the evenings which Plaintiff Ms. Bostick secured only by force and through sheer will power) and for months, weeks, days and hours thereafter, Plaintiff persistently attempted to complete the preparation of this document for final submission.  *See id*.  Despite the emergent nature of this action and despite the awareness of many of the Defendants named hereto that Plaintiffs' requests for relief can *only* be characterized as such an emergency, particularly in consideration of the young age of the minor Plaintiff, Defendants persisted in their attempts to make life

---

[8] *See* THE CONSTITUTION OF THE UNITED STATES WITH THE DECLARATION OF INDEPENDENCE (2012), at 81.  *See also* **Exhibit G**.

[9] *See* Plaintiffs Motion for Leave to File a Complaint which shall be filed in the days immediately following the filing of this Application.

increasingly difficult for Plaintiffs with the sole goal being to prevent Ms. Bostick from completing and/or submitting this Application to the Court. *See id.*

<u>Public Interest</u>.  Defendants intend to use the same technology they are currently testing on Plaintiffs in order to effectuate mass-slavery across the United States of America and potentially beyond the boundaries of the Nation.  To do so, they plan to use the technology as a means of making secret, invalid arrest such that persons who are arrested in that way can either submit to the technological arrest or find themselves in a seemingly compromised psychological state resulting in their complaints being ignored and explained as a mere mental health issue, the result of which would also lead to their institutionalization and render any relevant facts articulated by them entirely meaningless to the police, courts, or other officials and, therefore, easy to ignore, treat, and/or penalize.  Since slavery is prohibited by the U.S. Constitution and since the condition of slavery is currently being imposed on multiple persons throughout America, it is in the Public Interest to issue the preliminary injunction requested hereby.[10]

## VII. STATEMENT OF THE CASE

This action regards *Citizens United Opinion"* or the "*Opinion*" which was interpreted by Citizens United its partners, affiliates, members, and other persons and/or entities as including technology which falls far outside of the limited scope of *traditional media* sources

---

[10] On information and belief, the recent evacuation orders issued in the State of Washington are the result of weather technology which empowers its operator to change the weather conditions.  *See* **Exhibit I**.  As such, the State of Washington, is being evacuated in order that it may begin to implement circumstances and conditions which are contrary to the U.S. Constitution, position the elite to engage in a State-wide "slavery game," remain under the radar of agencies and governing bodies which would prevent the same, and create significant space in which to design a new "slavery game" planned community which would make it easy to exercise a State's discretion to use its power to cease property from undesirable citizens and streamline the implementation of the "slavery game" from home-to-home without any recourse available to those persons who will necessarily become trapped as "slaves" according to the nature of their *undesirableness*.  *See id.*  As a result, weather crises across the Nation are becoming more frequent as ran water is being deployed from places of natural origin in order to "produce" other *Truman-like* Show experiences.

in order to justify their plans to claim ownership over the Plaintiff, Christina Bostick ("*Ms. Bostick*") and her minor son, C.B.T.[11]  With an assumed ownership interest in Ms. Bostick's person, including as to her physical body; consciousness; emotions; creative abilities; and intellectual aptitude, as well as to any other skills, thoughts, ideas, gifts and talents, they relied upon advanced technology to inundate her with undesirable and unwanted communications which she never consented to the receive and which she was entirely deprived of an opportunity to be consciously aware of, possess knowledge regarding, or receive any notice warning her of the intended arrival of such communications.

The technology utilized by Defendants to breach Ms. Bostick's most basic American freedoms is known as Network Covert Channel (a "Covert Communication Channel" or a "CCC").  *See* Jing Tian, et al., *A Survey of Key Technologies for Constructing Network Covert Channel*, 2020 Sec. & Comm. Ntwrks., Aug. 5, 2020, at 1, *available at* https://www.hindawi.com/journals/scn/2020/8892896.  *See also* **Exhibit A**, at 1.  A CCC covertly transmits communications through an online information mechanism.  *Id.*  More descriptively, a CCC covertly transmits communications through a channel which exists under the network environment.  *Id.*  CCC technology was designed in order to convey secret messages while also protecting the identity of the message(s), the speaker(s), or the listener(s) throughout and/or following a communication transmission.  *See* **Exhibit A**, at 3. In other words, any potential observer—whether physically present or present by virtue of their access to the network—is rendered unable to detect the communication, nor the communicators.  *See id.*  Using a CCC in conjunction with operational controls, Defendants coordinated to build a firewall around the Plaintiff Ms. Bostick and trap her inside an

---

[11] Ms. Bostick was delivered over a month late, with the original due date being approximately May 10, 1985.

isolated field of communication by looping their respective channels into something resembling a hinged, link-style chain.

The CCC connection first became noticeable to Ms. Bostick in 2016; however, events related to it began long before that, including in 2007 when Ms. Bostick graduated from Spelman College and entered her first year as a law student at Georgetown University Law Center.   During that time, Citizens United filed its Complaint for Declaratory and Injunctive Relief regarding other bans which it purported to believe effected its plan to promote and distribute the film entitled, *Hillary*.   In 2010, the *Citizens United Opinion* issued just as Ms. Bostick transitioned from law school student to employed attorney. Simultaneous with the issuance of the Court's *Opinion*, Defendants used first-generation CCC technology to make Ms. Bostick into walking, talking, reality show which they broadcast to a live audience; however, Ms. Bostick could only discern their presence and/or communications at that time and generally considered thoughts that popped up to be odd or to have come out of nowhere and not be indicative of her own sense of reality or otherwise reflective of her own beliefs, morals, values, or impressions.   Then, in 2016 Defendants loudly alerted Ms. Bostick that they were turning up the volume; sometime thereafter she the technology was clearly upgraded and both she and it were infused with overwhelming energy which was likely electrical in substance and experienced by her as yet another hike in the volume of communications and extremely high vibrations pulsating throughout her body.   At that time, Defendants represented to her that the technology was the holy spirit. Contrary to what one might expect of such a religiously connotated experience, Ms. Bostick was instead inundated with screaming, hostility, racism, and other demeaning jargon by people identifying themselves by name and in the voices of persons with whom she attended

River Hill High School from 1999 until May of 2003 (the "RHHS Defendants").[12]  Throughout the initial portion of that verbal assault, the RHHS Defendants insisted that they were requiring Ms. Bostick to have an out of wedlock baby by force because she had committed adultery.  Years later, Defendants revealed that their involvement with her pregnancy was directly related to the pregnancies of several of the female RHHS Defendants and that Ms. Bostick was used as a means by which to improve the experience of their own pregnancies by eliminating and/or significantly reducing symptoms all-too-commonly attributable to that condition such that Ms. Bostick was required to "be the strong black woman" among them and used to suffer the brunt of the burdens of a collective pregnancy.

Their unwelcome, shocking, abusive, far more than (white) privileged perspective was all-too emblematic of an American form of slavery that long ago was supposed to have been extinguished from the entirety of the planet; therefore, it was ever more of an atrocity that the RHHS Defendants used forced bondage to constantly inundate her with racist,

---

[12] Immediately prior to Ms. Bostick's anticipated attendance at RHHS, the school and the school system implemented a new technology magnet ("Tech-Magnet") program which several persons who were forced to participate in the events described during the pendency of the communication.  In fact, they advised that the Tech-Magnet program was implemented in order to stack HCPSS with African American athletes but was actually more so contrived as a means by which to detract from both her arrival as a new student and her presence at the school itself.  As a new African-American student and compete with her such that she would be deprived of any and all potential friendships within the student body as it was expected to be composed, intentionally attempting to prevent her from having relationships with either person within her race, but more intentionally, to exclude her from the White "in" crowd entirely.  In fact, it was the exact intent of Howard County School System ("HCPSS") and the greater Clarksville community to rely upon early-generation CCC technology in order to deprive her of her inherent athletic ability and transfer the same to a white student, namely Defendant Megan Buescher ("Defendant Buescher").  In doing so, the Clarksville community and HCPSS hoped that Defendant Buescher would outshine Ms. Bostick while the African American recruits were to intimidate and humiliate Ms. Bostick, as well as her immediate family members in order to tear them down to size and represent to all of Howard County that members of the Bostick family were somehow lessor and/or generally inferior in effort to contradict the fact that they were districted to RHHS because they own property which was squarely situated within the geographical bounds that would always feed to RHHS and despite the vast extent of their collective academic backgrounds compared with that their neighbors; the significance and depth of their work ethic, and the impressive character of their numerous achievements; among other certifiably coveted, fact-based descriptions attributable to them.

discriminatory, harassing, demeaning abusive jargon which exactly reflected the extent of devolution inherent in their obvious ignorance, as well as their inability to have achieved any level of accomplishment over the entirety of their lives when compared to her. Therefore, they relied upon the ability of their parents to secure access to little-known technology in order that they might reduce me to a level of existence which bade them more comfort with their own miniscule, under-achieving, uninspired, perceptively diminished lives at expectant women, intended to remain unemployed and in the home, without ever having had a moment of maternity or otherwise being inclined to mothering whatsoever. On that basis, they determined that, even in their pregnancies, they were entitled to and literally could not raise children without securing a mammy—the necessity of which was far too much acknowledgment to offer the only woman they desired for that belittling position simply because her skin was brown and their skin was not brown.  Thus, they sought to reduce Plaintiff Ms. Bostick—both a graduate of Spelman College and of Georgetown University Law School, as well as a skilled litigator, then in the midst of a burgeoning legal career—to literal slavery and, thereafter, refused to release her for reasons which are both so easily discerned and so complex that there are no words which appropriately convey the depth of such American devolution.  devolved  they encountered as a result of their own pregnancies he further added that the ongoing covert communications being imposed on her were a punishment regarding their claims of adultery.  *See* **Exhibit H-1**.

After having first connected the CCC to Plaintiff Ms. Bostick, Defendants prenatally connected with her minor son—a connection which remains ongoing.   While Ms. Bostick (and quite possibly her son) continuously remained consciously aware of any

communications which occurred within the enclosed space, Defendants relied on various levels of control in order to enter and exit through the firewall where they were generally situated as communicators. Thus, Defendants' firewall forced Plaintiff Ms. Bostick to receive constant communication on an ongoing basis without also having any access to operational controls which might permit her to escape Defendants' communications. Furthermore, any potential observers who might object to the obvious hardship imposed on Ms. Bostick were unable to detect such communications; rather, outsiders in both the physical world and on the network were kept at bay, both as a result of the firewall and the CCC itself. Thereafter, Defendants divided the space within the firewall into blocks such that different communications could stream through different rooms without interfering with communications in an adjoining space. As such, Defendants were able to access only their own room or access various other rooms dependent upon their credentials.

In each respective CCC room, Defendants could employee various means and modes of "attack" dependent upon an agreed-to plan of action. Defendants constructed such plans into what they called games, whereby they attempted to force the Plaintiff Ms. Bostick to interact with them in various ways in effort to harass, demean, discourage, humiliate, abuse, bleed of information, manipulate, or otherwise take out their hostility upon her. Defendants' games employed a varied combination of attack measures, including but not limited to manipulating communications; forced extrapolation of information; involuntary modifications as to the content of information known specifically by Ms. Bostick; artificial deletion of information from her personally-built knowledge base, and/or alteration as to her experience of time, energy, emotions, health or other personal conditions which are generally only subjectively understood and/or experienced.

41

Simultaneously, Defendants continue to rely on Ms. Bostick's pregnancy as the bases for the auditory hostility and characterized it as biblical and/or religious in an attempt to convince her that the experience was symptomatic of pregnancy or postpartum depression, although such possibilities seemed strange given that she otherwise was in excellent health and experiencing no other pregnancy-related symptoms.  Hoping for a solution, Ms. Bostick sought and received regular medical attention whereby she was eagerly advised that her bipolar disorder diagnosis could not be accurate; thus, Plaintiff Ms. Bostick was forced to continue to endure such symptoms without medical remedy.  Then, around February of 2022, Defendants hired professional programmers to run a particularly hostile application within the communication field in order to further torment Ms. Bostick.  Having hired the programmers, Defendants took a break from the CCC.  In their absence, the programmers interacted with Ms. Bostick and became concerned as to her well-being, as well as the nature of her predicament.  Rather than proceed with the extent of the measures they were hired to perform, they plainly revealed that they were, in fact, human programmers and debunked the manipulations conveyed to her by Defendants such that she clearly understood that she was under attack by individuals who knew her personally.  The programmers also sought outside intervention and permitted additional persons through the firewall in order to discern a means of escape for Ms. Bostick.

Now apprised of the fact that she did not have a mental health issue at all, but that actual living persons were holding her hostage via technological means and attempting to convince her that—not only was she in slavery herself—but that she was going to have to kill herself in order to escape that condition, Ms. Bostick determined to file this Motion. However, since she began writing it on or about June 15, 2022, Defendants employed any

and every means conceivable in effort to prevent the filing of this action. Still, I prevailed and hereby file this Emergency Application to Justice Sotomayor for an Extraordinary Writ of Mandamus and/or Injunction and Temporary Restraining Order as to Mass Identity Theft in Conjunction with Deleterious Electioneering Communications Made Via Covert Communication Channels.

## VIII. STATEMENT OF FACTS AND RELEVANT HISTORIC BACKGROUND

Please note that the factual bases for this action is complex and, as such, requires a comprehensive investigation into all of the facts and circumstances. *See* Section X, *Relief Requested* (*infra*). However, what is clear is that all of the States named as Defendants to this Action have involved themselves in a "slavery game," they organized and implemented reliant upon the instruction of Willie Lynch as to how to make Plaintiff Ms. Bostick and her infant son into slaves in order that they might test their new technology before swelling to a slavery system accessible only to a wealthy minority existent both in the United States and abroad. *See* Section VII, *Statement of the Case* (*supra*). *See also* **Exhibit D**. In order to do so, Defendants programmed the CCC technology upon which their "slavery game" would operate using illiterate interpretations of English words, likely in homage to the plantation-style way of speaking in the old confederate South. In reliance of and emboldened by the written dialect, Defendants gave themselves permission to violate the entirety of the U.S. Constitution.

As to Plaintiffs, Defendants first deliberate contravention of the U.S. Constitution relied upon the guidance of the Honorable Justice Anthony McLeod Kennedy ("Justice Kennedy"), as articulated in the *Citizens United Opinion*. *See generally Citizens United*, 558 U.S. 310 (2010). In the *Opinion*, Justice Kennedy determines that modern laws passed

in order to regulate electioneering communications limit the First Amendment freedoms regarding speech. *See generally id.* However, likely unbeknownst to Justice Kennedy, when Citizens United first filed its Complaint for Declaratory and Injunctive Relief regarding regulations it purported to be a hinderance to distributing its political/electioneering film entitled, *Hillary*, it had already determined to rely upon the *Opinion* in order to implement, distribute, broadcast, and administer a technological "slavery game" whereby Plaintiff Ms. Bostick would become an interactive electioneering program, airing live and available to subscribers, members, and/or participating partners on a twenty-four-seven basis which featured a walking, talking, breathing, human, uninterrupted reality show.

Though the program quickly gained popularity, criticisms also poured in which recognized the hostile conditions being imposed upon a non-deserving human being and a pregnant woman, namely the Plaintiff, Ms. Bostick. To overcome such objections, Defendants refined their audience, catering to the Republican base by encouraging its audience and membership to continue interactive participation in order to rebel against the Federal Government's failure to build a wall between Mexico and the United States. According to Defendants, the Founding Fathers always intended for such a wall to be erected; in fact, Defendants concluded that by refusing and/or neglecting to build said wall, President Barack Obama II ("President Obama")  and President Donald J. Trump ("President Trump") both contravened the U.S. Constitution. In doing so, they had rendered the entirety of the U.S. Constitution obsolete, thereby paving the way for the "slavery game" to continue indefinitely and without consequence. Defendants' argument relied on an antiquated spelling of the word *defense* as it appears in the Constitution's Preamble:

> WE THE PEOPLE of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common ***defence***,

> promote the general Welfare, and secure the Blessings of Liberty to ourselves
> and our Posterity, do ordain and establish this Constitution for the United
> States of America.

*See* THE CONSTITUTION OF THE UNITED STATES WITH THE DECLARATION OF INDEPENDENCE (2012), at 37 (*emphasis added*).  Thus—perhaps ironically, perhaps regrettably, perhaps intentionally, certainly rebelliously—it illiterately interpreted the foreshown antiquated spelling to mean "da fence," as in "da club,"[13] rather than the *defense* which is more-commonly understood to signify a Federal responsibility to establish one national military.

According to his preparational writings, President James Madison ("President Madison" or "Madison") crafted and delivered a speech which served as an oral proposal for what would soon become the Bill of Rights.  *See* **Exhibit K**, at p. 2.  In his notes, President Madison wrote that the Bill of Rights must contain a statement asserting that both natural rights and doctrinal rights must be retained.  *See id.*(emphasis added). Collectively, natural rights, such as speech, and doctrinal rights (which establish elections

---

[13] In 2003, celebrated Grammy award-winning Hip-Hop artist 50 Cent released his single, In da Club from his debut album Get Rich or Die Tryin'.  *See* **Exhibit** J.  In da Club's lyrics include:

> Go, go, go, go, go, go
> Go, shawty, it's your birthday
> And we gon' sip Bacardi like its your birthday
> And you know we don't give a f*ck, its not your birthday
>
> You can find me in da club, bottle full of bub'
> Look, mami I got what you need if you need to feel a buzz
> I'm not into havin' sex, I aint' into makin' lov
> So come give me a hug if you into getting' rubbed

*See id.*  In 2009, the song was listed at number 24 in *Billboard*'s Hot 100 Songs of the Decade.  *See* Wikipedia, In da Club, available at https://en.wikipedia.org/wiki/In_da_Club.  It was listed at number 13 in *Rolling Stone*'s "Best Songs of the Decade." S*ee id.*  In 2010, it was ranked 448th in *Rolling Stone*'s 500 Greatest Songs of All Time list.  *See id.*  On February 13, 2022, it was performed by 50 Cent in the Super Bowl LVI halftime show.  *See id.*

as free in order to limit and qualify power) assure that the rights of "the majority of people" are guarded.  *See id.*  Madison went on to explain that in an elective government "all power [must be placed] in people."  *See id.*  Still, several of the delegates who were present at the 1787 Federal Convention (the "Convention") insisted that national elections should be decided by the States, rather than the people.  *See e.g.,* RUFUS KING, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 10-11 (Max Farrand ed., Yale University Press 1991)(1787), relevant portions attached hereto as **Exhibit L**.  On June 21, 1787, the States voted nine (9) to two (2) that at least the members of the House of Representatives should be elected by the people, rather than the States.  *See* **Exhibit L**, at 353.

Ultimately, the Founders would ratify a constitution that required both branches of the legislature to be elected by the People and the executive branch to be elected by Electors who would collectively become known as the Electoral College.  *See* U.S. CONSTITUTION, Art. I, Sec. 2 & Art. II, Sec. 1, at 37-38, 48.  It was a decision that jived with Madison's aforestated position, as well as the articulated opinion of Pennsylvanian delegate James Wilson: "[e]lection is the exercise of *original* sovereignty in the people – but if by representatives, it is only *relative* sovereignty."  *See* **Exhibit L**, at 365.  However, as to the States, Madison would take the sovereignty analysis a bit further than New York's Yates and insist that not only was the original sovereignty in the people, but it was not at all in the states:

> We are vague in our Expressions – we speak of the sovereignty of the States – they are not sovereign – there is a regular graduation from the lowest Corporation, such as the incorporation of mechanicks to the most perft. Sovereignty – The last is the true and only Sovereignty – the states are not in that high degree Sovereign – they are Corporations with power of Bye Laws –

*See* **Exhibit L**, at 477.  Connecticut's William Samuel Johnson saw an opportunity for a compromise:

> The two sides of the house reason in such a manner that we can never meet –
> Those who contend for an equality of Votes among the States, define a State to
> be a mere association of men & then say these Associations are equal – on the
> other hand those who contend for a Representation in proportion to numbers,
> Define a State to be a District of Country with a certain Number of Inhabitants,
> like a parish or County, and then say, these districts shd. Have an influence in
> proportion to their Numbers of Inhabitants – both reason justy from yr.
> premises – we must then compromise – let both parties be gratified – let one
> House or Branch be formed by one Rule & & the other by another.

*Id.*, at 476-477.  Thus, the States voted six (6) to three (3) that the House of Representatives would mirror the number of a state's inhabitants and the Senate would consist of representatives who each held the same proportion of power regardless of a state's respective population.  *See id.*, at 477.  Clearly then, neither Madison, nor his contemporaries could have intended for a State, a plantation, nor any other incorporated or otherwise enterprising entity to fall within the definition of a *person* within the context of the American democracy.  *See id.*  Indeed, neither side of the argument viewed an entity as a person in and of itself, but only as a means of defining or associating a group of actual persons.  *See id.*  Rather, the Founding Fathers took active steps to prevent what they would likely consider to be a desecration of their cherished  democracy. *See generally id.*

That being said, it must be noted that the Framers did not fail to find ways in which to secure an advantage to themselves on the bases of businesses which primarily and most lucratively consisted of slave-labor-dependent plantations they personally owned and profited on the bases of.  Rather than make those businesses persons, they stewed about

47

and eventually carved out other means by which to secure priority participation in the new democracy.  On May 28, 1787, Madison included a footnote in the official Records of the Federal Convention:

> Previous to the arrival of a majority of the States, the rule by which they out to vote in the Convention had been made a subject of conversation among the members present.  It was presented by Gouverneur Morris and favored by Robert Morris and others from Pennsylvania, that the large States should unite in firmly refusing to the small States an equal vote, as unreasonable, and as enabling the small States to negative every good system of Government, which must in the nature of things, be founded on a violation of that equality. The members from Virginia, conceiving that such an attempt might beget fatal altercations between the large & small States, and that it would be easier to prevail on the latter, in the course of the deliberations, to give up their equality for the sake of an effective Government, than on taking the field of discussion, to disarm themselves of the right & and thereby throw themselves on the mercy of the large States, discountenances & stifled the project.  Convention &c. was agreed to nem. con. for reasons similar to those above mentioned.

**Exhibit L**, at 10-11.  The southern delegates bided their time over the course of the Convention, but on May 31, 1787, Madison insisted that elections must include bodies of government which are popularly elected.  On June 7, 1787, the Convention agreed that House of Representatives would "be elected by the people in Districts to be formed for that purpose." *See id.*, at 149.

On July 11, 1787, the southern States played their hand, attempting to convince the other representatives that, despite the current tax law defining the black population as three-fifths (3/5) of its total for tax purposes, blacks should be deemed equal to whites for the purposes of calculating representative electors. *See id.*, at 581.  In reading the Record,

it quickly becomes clear that what became known as the Three-Fifths Compromise was not based on a belief that an individual black person possessed only three-fifths of the intellect that his white counterpart could claim; rather, the fraction considered the whole of the black populous, concluding that sixty percent (60%) of Blacks were intellectually apt and, therefore, capable of equal productivity and value, while forty percent (40%) were intellectually inapt and not so capable.  However, given the ability of white slave owners to vote on behalf of three-fifths of their slaves without any input from them, nor any regulation from the government, it better suit southern delegates to have them deemed equal notwithstanding their continued and perpetual status as slaves.  James Mason ("President Madison" or "Madison") spoke up on the matter:

> Mr. Mason could not agree to the motion, notwithstanding it was favorable to Virga. because he thought it unjust.  It was certain that the slaves were valuable, as they raised the value of land, increased the exports & imports, and of course the revenue, would supply the means of feeding & supporting an army, and might in cases of emergency become themselves soldiers.  As in these important respects they were useful to the community at large, they ought not to be excluded from the estimate of Representation.  He could not however regard them as equal to freemen and could not vote for them as such.  He added as worthy of remark, that the Southern States have this peculiar species of property, over & above the other species of property common to all the States.

**Exhibit L**, at 581.

Having fallen short of securing additional voting power, the southern landowners acquiesced to a different method of calculating representative electors which would prove to bolster their voting power despite not being able to vote on behalf of all of their slaves.  On June 18, 1787 the Convention agreed to divide the States into election districts and to

49

appoint Electors (now referred to as the Electoral College) as assigned to each district such that based on population as determined by a regular census, the Electors would choose the President.  *See id.*, at 291-292.  At that time, because landowners voted on behalf of their slaves in addition to themselves and, as such, could uninhibitedly use the vote intended for their slaves in order to vote against the interest of those slaves, each plantation essentially amounted to a voting district in and of itself.  It follows that the landowners could also maintain power by themselves serving as Electors in the college.  It was a system southern Whites largely preferred.  So much so that in 1911, Republicans relied upon a majority in the House of Representatives (the "House"), a majority in the Senate, and a Republican President to enact limiting the possible number of representatives electable from the fifty (5o) States as members of the House to not more than 435 persons, thereby guaranteeing a concentration of power to enduringly exist among the southern states without risk of dilution.  *See* **Exhibit M**.  In that way, both an old and a new America afforded businesses and the land upon which those businesses sat a renewed, but misplaced, disproportional voice in the governance of its democracy.

To the extent the Leaders of the American Revolution and their descendants held ownership over businesses which were largely, if not entirely, reliant upon the labor of slaves who did, in fact, possess their own individual voices, no foundation exists upon which one might argue that the Framers intended for such businesses to count as people under the U.S. Constitution.  Rather, as a governing body, the delegates held no authority over how a slave owner went about (or did not go about) collecting the political opinions of his slaves in order to realize their Constitutionally-afforded right to vote.  Indeed, the debate reflected by the official Record of the Federal Convention, as well as related notes and

correspondence written by such delegates reflects a clear majority intention not to legitimize any assignment of personhood to enterprise.  *See* **Exhibit L**, at 580-581.

Indeed, that there was any compromise at all indicates that southern slave owners had their own, different motives for coming to an agreement as to the equality of black persons.  *See id.* Once securely returned to the conventional south and what may have seemed to be a totally different world from contemporary nature of the city of Philadelphia, slave owners could curb the compromise in such a way as to favor themselves to the detriment of the slaves they owned as chattel property.  Thus, they quickly assumed the voting rights of their slaves and, without context, passed the tradition of doing so to their descendants who perpetuated false notions that being in possession of slaves afforded them additional voices in the democracy—voices which would be attributable as the articulable, direct opinions of the business, rather than the person holding ownership over it or the persons necessary to performing its function.

Quite contrary to what must have been Justice Kennedy's intention in overruling laws intended to regulate electioneering communications as to businesses, as interpreted by Defendant Citizens United and the other co-Defendants, the *Citizens United Opinion* serves, not only to unconstitutionally grant personhood and top-heavy vocal participation in our democracy to business entities but, in doing so, to resurrect the antebellum south by simultaneously diluting the actual voices of persons who perform the work necessary in order for such businesses to function.  In other words, *Citizens United* can and has been interpreted to legalize a condition of the old south which allows the business entity (historically known as *the plantation*) to speak on behalf, overtop of, and/or to manipulate the political opinions of its workforce (historically known as *its slaves*), even where the

initiatives, policies, and politicians its lobbies are outrightly against the interest of that workforce, not to mention capable of leveraging its vast wealth over its workforce such that it can lobby for lower wages as to them and ultimately for a return to a race-based slavery system.  Therefore, Justice Kennedy's *Opinion* (perhaps inadvertently) granted Defendants with what they believed was their absolute right to do whatever they wanted, so long as it was in the context of an electioneering communication.  With that in mind and reliant upon rules made according to *Citizens United* dicta, Defendants enslaved a young, brown Ms. Bostick and her infant son by use of clandestine CCC technology.

In fact, the religious (far) right wing of the Republican Party would take it several steps beyond enslavement.  Though long dispossessed of any credible education, a tradition of rebellion had consistently been passed from generation to generation in the southern States in order to enforce a continued class system rooted in its slavery history and perpetuate the myth of southern hospitality.   In fact, at the Convention, Alexander Hamilton took issue with the fact that several of the participating States had failed to make any provision within their respective constitutions to allow the power of the new national government to abridge the powers assumed by such individual states.  *See* **Exhibit L**, at 294-295.  Thereafter, and throughout the Convention, many delegates objected to holding the U.S. Constitution paramount to the respective State constitutions, declaring that the State constitutions had been written just after the Declaration of Independence and within the same spirit, rendering each individual State's constitution paramount to any national government that would be implemented.  *See generally id.  See also e.g. id.*, at 329.  Ultimately, the delegates resolved on Article IV, Section 1 which affords the states full faith and credit as to public acts, records, and judicial proceedings.  *See* U.S. CONSTITUTION, at

54.   However, given the staunch opposition to anything short of full sovereignty being afforded to the several States, it is not surprising to learn that southern States balked at any loss to their sovereignty and maintained the continuity of rebellious traditions to ensure that their respective State constitutions would not and could not ever be overridden by the National government.   Thus, in addition to considering their own constitutions supreme law in their respective lands, they instilled a system of circumvention by implementing terms and clauses into their respective State Constitutions which would covertly define their State as falling just outside the power instilled in the Federal government and enable them to engage in actions which contradicted the rights afforded according to the U.S. Constitution. *See e.g.* **Exhibits G** and **N**.

For approximately a century, State constitutions appear to have largely imitated, if not plagiarized, the Federal Constitution, or the more rebellious Declaration of Independence.   *See e.g. id.*   However, at the conclusion of the Civil War, southern states took necessary steps to *preserve their way of life*.   For example, months after the Union declared victory as to the Civil War, the State of Georgia, re-wrote its Constitution.   *See generally e.g. id.*   For the first time, it included a Preamble which stated:

> We the people of the State of George, in order to form a permanent Government, establish justice, insure domestic tranquility and secure the blessings of liberty to ourselves and our posterity, acknowledging and invoking the guidance of *Almighty God*, the author of all good Government do ordain and establish this Constitution for the States of Georgia.

*See id.* (emphasis added).   This was also the first time Georgia acknowledge Almighty God, as well as the first time it invoked his guidance.   *See generally id.*   In doing so, Georgia placed Almighty God above all other gods and distinguished him from the God identified in

the revolutionary and founding documents of the Nation as "Nature's God" or the "Creator" God. *See id.*  *See also* U.S. CONSTITUTION, at 81-82.

That such a differentiation was, in fact, intentional becomes certain upon examining the remaining text: according to Georgia, Almighty God is "the author of all good Government;" thus, in the wake of loosing the Civil War and the abolishment of legalized slavery, Georgia accuses the winning Union's God—Nature's God and the god universally known as the only God—of <u>not</u> being the author of all good Government.  As a complete statement, Georgia's initial Preamble serves to  absolve the State of any obligation to the United States, whether according to the U.S. Constitution, any proceeding or subsequent governing National documents, or God Himself.[14]  *See generally id.*  To date, Georgia's Constitution maintains the same allegiance to Almighty God and its Preamble states as much:

> To perpetuate the principles of free government, insure justice to all, preserve peace, promote the interest and happiness of the citizen and of the family, and transmit to posterity the enjoyment of liberty, we the people of Georgia, relying upon the protection and guidance of *<u>Almighty God</u>*, do ordain and establish this Constitution.

CONST. OF THE ST. OF GA., Preamble (2017), attached hereto as **Exhibit N**.

In this more recent revision, Georgia not only seeks Almighty God's guidance, but also his protection.  *See id.*  That Georgia has done so is no accident; rather, including a request for protection both denotes and connotes that there presently exists an impending risk of such magnitude that it is necessary to legally memorialize its attempt at

---

[14] Other official American documents and oaths include references to God, including, but not limited to "In God We Trust" and "One Nation Under God."

inconspicuously making such a purposeful, pointed, and clearly loaded request. This argument is bolstered by the consistent usage of the word *insure* in its constitution: "*insure* justice to all." *See id.* (emphasis added). To insure justice to all means that Georgia has either arranged for some sort of compensation to qualifying persons in the event that justice is loss, denied, or otherwise damaged as to them or that they are offering protection to some chosen faction of the population in the event that the remaining persons do, in fact, receive justice to the insured groups detriment.[15] Rather, it is the homophone *ensure* that should be included in the place of *insure*; the use of *ensure* in place of *insure* would effectively declare Georgia's intent to make certain that justice does, in fact, come to all within its geographic boundaries.

It is no accident that Georgia *insures* justice to all, rather than *ensures* it, particularly in light of the remainder of the statement which indicates its intent to *insure* justice to all, but—to whatever extent no such justice does come to all—Georgia will maintain the status quo by sustaining peace in its presently existing manifestation while continuing to lobby for the interest and happiness of its citizens. Then to the extent any such liberty is secured as

---

[15] The term *insure* is a verb, defined as:

    (1)  to arrange for compensation in the event of damage to or loss of (property), or injury to or the death of (someone), in exchange for regular advance payments to a company or government agency; or,

    (2)  to secure or protect someone against (a possible contingency).

Merriam-Webster (11th ed. 2022), *available at* https://www.merriam-webster.com/dictionary/ensure.

On the other hand, the term *ensure* is also a verb, defined as:

    to make certain that (something) shall occur or be the case.

*Id.*, *available at* https://www.merriam-webster.com/dictionary/insure.

a result of those lobbying efforts, it will transmit the benefit of enjoying that liberty as an inheritance to persons who can be credibly identified as persons who may legally accept such an inheritance.  All of the afore examined text must be considered within the context of Georgia's clear intent to perpetuate only of the principles of free government, without ever having to implement any genuine representation of an actual free government itself, as required by the U.S. Constitution.  *See id.*  Nine (9) other States who were apart of the Confederacy or supplied troops to it also have strange praises to Almighty God in their respective constitutions, including Alabama, Arkansas, Florida, Kansas, Kentucky, Missouri, North Carolina, Tennessee, and Texas, while the Commonwealth of Virginia and South Carolina each make equally bizarre references to God despite using terms other than Almighty God in order to do so.  *See generally* **Exhibit O**.

It is in the spirit of the confederate rebellion that Defendants attempted to consider themselves *American* missionaries (despite the fact that they were still present within the continental United States) and took up a charge to *correct* the behavior of *all* "black sinners." Realizing the extent of what CCC technology was capable of, they venerated it, as well as a myriad of possibilities they imagined could derive by employing its use.   In fact, Defendants redefined their original self-estimation and, rather than continue to justify their actions within the context of missionary work, they traded their Christianity for a pipedream rooted in constitutional violations—now they were slave masters.  What they believed to be new insight, led them to the false realization that, despite having already tortured Ms. Bostick for far longer than originally planned and despite Ms. Bostick's consistent reliance upon the teachings of her belief system which promised that God would come to her rescue, the experience had thus far not resulted in any miraculous revelation of the Christian deity, nor

56

any other deity.  Perhaps, Defendants then surmised, it was they who were the true gods; thus, each individual person imagined themselves to be an idol, in and of his or herself, who could independently and unilaterally force Plaintiff Ms. Bostick to submit to him or her directly and thereby prove that he or she was, in fact, powerful far beyond his or her coconspirators.  Or maybe, Defendants auditorily colluded, the collective constituted *oneness* and therefore God in the form of a commune.[16]  Through the *power* of CCC technology they had not even created, nor programmed themselves, they deemed themselves mutually capable of forcing the occurrence and/or fulfillment of various Christian prophesies which they assumed—without investigation, evidence, experience, or expertise—had not already come to fruition.

While half of the group focused on oneness as individual lay persons, the other half of the group focused on the new personhood bestowed upon their respective business entities according to their interpretation of the *Citizens United* Opinion; as they saw it, if their business were not defined as individual persons, their new condition as such presented an opportunity for religious rebirth.  First, they relied upon rumors that President Obama was actually the angel Lucifer and that his presidency was a warning that the world was, in fact, coming to an end.  Then they credited themselves with responsibility for bring about that conclusion, merely as a result of Plaintiffs' ongoing persecution.  Next, they justified the creation of a technologically invented, actively participatory alleged almighty (though ignorant) god.  Simultaneously, they instructed hired programmers to reprogram their CCC technology to operate in such a way as to represent how they believed the holy spirt would

---

[16] *See* Rasha, ONENESS (Earthstar Press 2003) (2008) (presenting a step-by-step instructional manual on how to integrate multiple consciousnesses to become one multiverse or multiconsciousness (i.e. multiple persons all thinking collectively).

conduct itself if it were actually present within the unconstitutional experience imposed on Plaintiffs. *See* John 14:26;[17] *see also* John 15:7-15. Thereafter, each Defendant business entity or organization represented itself through its "holy spirit," which it then used in conjunction with companion CCC technology which operated by and through Hollywood and employing various imagery to be projected into her home in order to torment her and further impose chaos on Plaintiffs as a part of the "slavery game." *See* **Exhibit H**.

The pandemonium imposed by Defendants included ensuring that various products purchased by Plaintiff Ms. Bostick would not work; the electronics in her home were all hacked and compromised, including the washing machine which ran but failed to produce clean clothing or otherwise stained her clothing despite being repaired, as well as her computer, her television, her printers, etc.; they visibly ran technology through her son which made him mouth words he was not cable of knowing, insisting that she had to kill him in order to make it stop, or other technology where various personalities streamed through him from moment to moment which neither he, nor she could subdue; they coerced the judiciary against her or otherwise convinced them to actively participate in the "slavery game," causing her to lose cases which were prematurely adjudged against her clients without any cooperating judge ever reading her motions or pleadings and, instead, pre-preparing rulings and reading them as conclusions to hearings without considering any of the information communicated during oral arguments; a key to her home was reproduced and used each time she exited in order to steal precious things from her home until she finally replaced the lock on the front door; a key to her car was stolen and her car was repeatedly broken into, vandalized and stolen from her; they forced her to purchase items

---

[17] The scripture reads: "But the Helper, the Holy Spirit, whom the Father will send in My name, He will teach you all things, and bring to your remembrance all things that I said to you."

she otherwise would not have purchased by inundating her with communications directing her to do the same and overpowering her with synthetic energies which physically forced her to acquiesce to their demands; the drove birds into her home to fly around and torment both she and her son, then left them dead on the back porch; they inundated her home with flies which often exhaustedly fell seemingly dead, but were resurrected often to swarm around her head; they ripped things down from the walls; overwhelmed her home with electricity and noise; deprived her of sleep in order to force her into madness or, at least prevent her from being able to work; and refused her service at various daycare centers and camps in effort to prevent her from working especially if working involved the preparation of documents required in order to initiate the immediate action.  *See* **Exhibit P**; *see also* **Exhibit H**.

Although they consistently maintained that their actions were possible because they were gods, they also could not prevent themselves from being tickled by the Hollywood's CCC technology and its ability to create circumstances which mirrored the events depicted in their favorite horror films.  Thus, they fell far short of *holy* in their representation of spirit.  Their failure was not surprising given their boastings about being too significant to read anything, including any Biblical text regarding the characteristics of the holy spirit; rather, they attempted to order Plaintiff Ms. Bostick to read such scripture to them.  She refused. Defendants then had no choice but to succumb to an elementary understanding of their own claimed religion and—also being ignorant of their own history—they were forced to repeat the errors of their ancestors by baselessly and continuously tormenting Plaintiff

Ms. Bostick—even to the point of insisting that she was Tituba reborn.[18]  They resorted only to fantastical fairytale magic, the terror imposed by mystical beings in celebrated horror films, and/or witchcraft they attempted to attribute to the practice of Wiccan before Plaintiff Ms. Bostick apprised them that it was a religion practiced in honor of a shared supreme deity, dependent on righteousness to effectuate its ceremonial rituals.  Finding themselves corrected, they insisted that, despite her evident Christian knowledge, background and upbringing, they were jealous of Ms. Bostick and, as such, she was still only ever worthy of a life of enslavement because she was not a white person.  Nor had Plaintiff Ms. Bostick pledged a Greek organization which they purported would have afforded her some protection as to Defendants, at least according to some of the white Greek and/or the black Greek participants.

Whether fully reliant upon a purported allegiance to what its authors consciously included as a named, competing god or upon some other obscure introductory statement included in a state constitution—whether dependent on their fraudulent interpretation of the *Citizens United Opinion* or based on the foolish notion that the Federal Government failed to provide for the common *da fence*, all of the States named as Defendants to this Action have involved themselves in a "slavery game," originally organized under the authority of Almighty God who the represented as communicating  communicates using an the electronically-altered voice of one of the Defendants and booming it through the covert technological CCC system in an attempt to override Plaintiffs' Constitutional rights and, instead, directly subject them to secret punishment as *sinners* left in the hands of an angry

---

[18] Arthur Miller, THE CRUCIBLE (Penguin Pub. Group 1952) (1976), including the character Tituba who was a brown-skin enslaved girl and the first female to be accused of practicing witchcraft during the Salem witch trials of 1962.  See also Wikipedia, Tituba, *available at* https://en.wikipedia.org/wiki/Tituba.

*god* who must, consequently, be forced back into slavery.[19]  However, the human posing as Almighty God was inept in his understanding of such doctrine and for the past several years, Plaintiff Ms. Bostick repeatedly overcame his commands by meaningfully following the actual doctrine.  As the communications became more harsh and the resulting physical consequence more severe, Plaintiff Ms. Bostick came to the realization that her experience was not the result of pregnancy, post-partum depression, stress, anxiety, nor any other explanation offered by bewildered medical professionals.  To the contrary—the consistent purely irrationalities communicated to her as religious law and order were, in fact, the result of human, rather than divine error.

---

[19] The text of Jonathan Edwards ("Edwards") sermon, entitled *Sinners in the Hands of an Angry God* is required reading in Howard County Public Schools; thus, at least the RHHS participants were likely to have reviewed it during their high school tenure.  In the text, Edwards delivers a scathing portrayal of his Connecticut parishioners during the year 1791.  *See* **Exhibit Q**.  According to Edwards,

> [t]he use of this awful subject may be for awakening unconverted persons in this congregation.

*See id.*, at 5.  Edwards famously constructed the sermon around Deuteronomy 32:35:

> Vengeance is Mine, and recompense;
> Their foot shall slip in due time;
> For the day of their calamity is at hand,
> And the things to come hasten upon them.'

Thus, according to Edwards, "[s]in is the ruin and misery of the soul; it is destructive in its nature, and if God should leave it without restraint , there would need nothing else to make the soul perfectly miserable."  It is within that context, that Defendants felt themselves justified in imposing religion on Plaintiff Ms. Bostick who they believed to be less sanctified then each of them and when Ms. Bostick refused to convert to either Islam or Catholicism, they attempted to torment her for her assumed lack of appropriate piety.  However, Defendants soon became more and more angered by Ms. Bostick's understanding of various religious doctrines and practices; familiarity with Biblical scripture; and the strength of her Christian faith.  Their anger motivated them to carry out a contrived plan to destroy Ms. Bostick by destroying her faith since God had not rescued her from them, establishing for them that they themselves were gods.  They, therefore, once again lost their concept of religion.  Thereafter, they soon forgot their falsely-rooted belief that they had become gods during their collective persecution of Ms. Bostick.  As such, the resorted to pure torture absent any bases in religion, with the intent of bringing her to ruin or death.  When that plan failed, they tortured her only in effort to prevent her from initiating this action.

Even so, the humans behind the ordeal determinedly attempted to force Plaintiff Ms. Bostick to submit to their authority and for the past ten (10) months, prevented the preparation, completion, and filing of this Application, as well as any and all corresponding documents by using CCC technology to torture, terrify, and restrict Ms. Bostick as to her physical ability to engage in common daily activities, among other injustices they carried out as a means by which to prevent themselves from being disciplined on the bases of the acts and actions herein described.   As a result, on an ongoing basis, Defendants deprive Plaintiffs of rights made certain to them as American citizens by each of the provisions described in Section V (*supra*).  Of greatest import, Defendants did secretly enter into an agreement to play a technological/virtual "slavery game," premised on the more lenient speech laws set forth in Citizens United.  To that end, Defendants attempted to virtually arrest and torture Plaintiff Ms. Bostick in order to make her and her son into "slaves" and did so according to the steps outlined by Willie Lynch.  *See* **Exhibit D**.  The Defendant business entities insisted that they each amounted to a person who was permissibly engaging in an electioneering communication.  The entire episode was a practice exercise used to test the technology in preparation for future covert operations in order to propagate conditions of slavery.  Bu engaging in such preparation, Defendants did, in fact, succeed from the Union and covertly establish a confederacy as slavers with the goal of globally legalizing technological slavery and/or engaging in a coup as to the American government. Having so seceded, the Defendant States no longer exists as sovereign units, but only as a treasonous confederacy.

In addition to the aforestated facts, Defendants intentionally read American laws and the American Constitution in an illiterate way, as a means of paying homage to the old

south.    In doing so, Defendants violated almost every clause in the United States Constitution, betting that one young black woman could not overcome the "Almighty God" program they hired programmers to develop for implementation within the CCC technological network and/or that she would otherwise be forced to convert from Christianity to Islam and control of her could, therefore, be transferred to the authority of a foreign government.    However, Plaintiff did not convert and ultimately became the only Christian present within a covert technological system capable of permitting access to up to 49,999 visitors per day, per State, forcing Defendants to acknowledge that the Republican Party is not, in fact, the religious center of America.    *See Citizens United*, 175 L.Ed.2d 753, 887 (2010).

To be more specific, Defendants actions include, but were not limited to contravening the U.S. Constitution as is described herein below:

· ***Defendants violated Art. I, Sec. 2 of the U.S. Constitution*** by subjecting Plaintiffs to governance implemented by elected leaders from States outside the State of Maryland where Plaintiffs are domiciled.

· ***Defendants violated Art. I, Sec. 8 of the U.S. Constitution*** by determining that the Preamble requires the Federal Government to "provide for the common defence," interpreting the antiquated spelling of the modern "defense" to mean that they could impose themselves on Plaintiffs using covert communication and other technologies because no boundaries were put in place by the Federal Government.

· ***Defendants violated Art. I, Sec. 8 of the U.S. Constitution*** by failing to allow the Federal Government to regulate commerce between them and participating in covert transactions between participating States, not the least of which was the trade of Plaintiffs as slaves by use of their covert technology.

· ***Defendants violated Art. I, Sec. 9 of the U.S. Constitution*** by suspending the privilege of the Writ of Habeas Corpus such that Plaintiff Christina Bostick could be charged with the Biblical crime of adultery, arrested on that basis, tried only within the covert technology, and denied any redress or a public hearing.

· ***Defendants violated Art. I, Sec. 9 of the U.S. Constitution*** by assigning Titles of Nobility to various elected leaders and/or other persons, interpreting them to grant superior rights to such persons and thereby permitting those persons to infringe upon the Constitutional rights afforded to Plaintiffs.

· ***Defendants violated Art. I, Sec. 10 of the U.S. Constitution*** by entering into a "Treaty, Alliance, or Confederation" and/or by entering into a "Agreement or Compact with another State" in order to collectively participate in a "slavery game," during which time they did "engage in [a virtual] War" without being in imminent danger.

· ***Defendants violated Art. II, Secs. 1-3 of the U.S. Constitution*** by refusing to recognize the executive power vested in any president of the United States elected since 2008 and by representing itself as various Presidents in order to manipulate and control Plaintiffs.

· ***Defendants violated Art. III, Sec. 1 of the U.S. Constitution*** by insisting that any hearing regarding the matters articulated herein be heard within the technological system such that it is to be "heard" (as in a legal hearing) and not seen publicly and further violated this clause by taking deliberate action to prevent the filing of the immediate complaint.

· ***Defendants violated Art. III, Sec. 2 of the U.S. Constitution*** by attempting to convince Plaintiffs that the Supreme Court did not and could not have original jurisdiction in this matter, despite admitting that at least the State governments of Maryland, Georgia, and South Carolina participated in coordinating the "slavery game" and further violated this clause by attempting to legitimize its technological arrest of Plaintiffs by stating that slavery was, in fact, legal since she had committed the crime

of adultery which is not, in fact, a crime and denying her the opportunity for a trial by jury.

· ***Defendants violated Art. III, Sec. 2 of the U.S. Constitution*** by secretly seceding from the Union and forming a confederacy in order to perpetuate the "slavery game" with the goal of reinstating legalized slavery.

· ***Defendants violated Art. IV, Sec. 1 of the U.S. Constitution*** by not remaining sovereign as individual States but, instead, acting as one collective confederacy.

· ***Defendants violated Art. IV, Sec. 2 of the U.S. Constitution*** by failing to honor Plaintiffs right to enjoy all of the same privileges and immunities afforded to other American citizens.

· ***Defendants violated Art. IV, Sec. 3 of the U.S. Constitution*** by operating a State within a State, such that only certain State citizens were governed under each respective state's public laws while other citizens were governed only in accordance with the operable rules of the "slavery game."

· ***Defendants violated Art. VI of the U.S. Constitution*** by depriving without compensation Plaintiffs' ancestor, William Clayborne ("Clayborne"), of land he rightfully purchased from the original inhabitants of the State of Maryland—the Susquehannock; by attempting to conceal Plaintiffs relationship to Clayborne both prior to and during the period of time in which she wrote this Application and related documents; and by concealing the truth as to how they deprived Clayborne of his land by re-writing history to reflect a treaty between Clayborne, the Susquehannock people, and Maryland leadership; such a treaty was never entered into, cannot be located, and does not exists.  *See* **Exhibit P**.

· ***Defendants violated the First Amendment to the U.S. Constitution*** in a plethora of ways, including, but not limited to the following acts:

   **Freedom of Religion**

▫ Alleging to be making and to have made a valid arrest and therefore to be legally placing Plaintiff Ms. Bostick in slavery based on unsubstantiated accusations that she did not adhere to a religious commandment, namely "[t]hou shall not commit adultery" which is not codified as a criminal act.

▫ Forcing Plaintiff Ms. Bostick to participate in a religious confession—a distinctively Catholic practice—despite knowing and repeatedly being informed that Ms. Bostick and has never been Catholic.

▫ Alleging that Ms. Bostick had been and would continue to be subjected to abuses and harassments that only she could hear because she was being punished by God for having a baby out of wedlock, and for committing adultery.

▫ Alleging that Ms. Bostick had been and would continue to be subjected to abuses and harassment that only she could hear because she was being punished by a fraudulent, technological representation of Almighty God for not becoming a homosexual as a result of the abuses and harassment she was subjected by use of covert technology.

▫ Imposing a fraudulent, technological representation of Almighty God on Ms. Bostick's consciousness and attempting to secure her obedience to him in full knowledge that it was a mere human representing Almighty God and that they, themselves, interpreted Almighty God to differ from the God worshipped by Bible-based Christians.

▫ Playing a "slavery game" based on Biblical justifications that a slave must obey his master.

▫ Prohibiting Plaintiff from attending church; making it impossible for Plaintiffs to attend to church by making Ms. Bostick's infant son scream and holler during services; making loud noises and communications during church services such that Plaintiff could not participate.

▫ Insisting that she was the Black Madonna and further insisting that the experience was punishment for being the black version of the Mother Mary.

▫ Failing to acknowledge Plaintiff Ms. Bostick's baptism as cleansing her of any sins Defendants alleged to be punishing her on the bases of.

▫ Consistently calling her a sinner.

▫ Using covert CCC technology to generate images of demons in an attempt to convince Plaintiff Ms. Bostick that she was possessed.

▫ Insisting that she must convert to Islam because only white people were allowed to be Christians.

▫ Using covert technology to harass her by depicting themselves as white people and insisting that they were angels sent to punish her.

▫ Involving persons as leadership in the "slavery-game" who purported to be Catholic but had no religious education to rely on in their administration of the same.

▫ Using covert technology to act out and change the conclusion of Biblical stories, insisting that Ms. Bostick had been one of the characters involved in said Biblical story, and blaming her for the inappropriate and/or improper outcome they included as a destructive deviation from the original plot/text.

▫ Refusing to allow Ms. Bostick to sleep in order to contradict Biblical scripture which declares that people require rest.

▫ Refusing to allow Ms. Bostick to keep the sabbath.

▫ Insisting that Ms. Bostick is not Christian, but is, in fact, Islamic, Mormon, Seventh Day Adventist, Atheist, or a part of any other institutionalized religious or non-religious construct excepting Christianity.

▫ Forcing Ms. Bostick to read the Bible or otherwise forbidding her to do so.

▫ Impressing upon her consciousness that any dooming or damning statement in the Bible was intended by God to be communicated directly to Ms. Bostick.

▫ Insisting that Ms. Bostick's whole family was being punished for sinning.

▫ Insisting that her minor son was not a real person or otherwise not actually *her* son and could therefore be inundated with technology and used as if he were a slave on that technology because she had an unbaptized baby outside of wedlock.

▫ Insisting that Ms. Bostick was not allowed to marry.

▫ Insisting that Ms. Bostick was Mary Magdalene and using the covert CCC technology to represent to her their perceived experience of what Mary Magdalene might have endured according to scripture.

▫ Relying upon Old Testament scripture they heard her read during a "discovery" period held prior to allowing her to hear (i.e. holding the hearing) and holding a seven-year long sabbath in which they alleged not to work other than to torture her and that she was the only individual working during the sabbath which they interpreted to equate to a seven (7) year long period of lent.

▫ Insisting that Jesus would have to return if Ms. Bostick were ever to be rescued from the experience.

▫ Attempting to convince Ms. Bostick that she was not allowed to file a legal action and that all trials or hearings must be held via the covert CCC technology, or she would be violating biblical laws.

▫ Failing to afford Ms. Bostick a representative at hearings they held regarding her alleged indiscretions despite recognizing that she was entitled to one based on her status as a Christian.

▫ Insisting that there is no God and that Ms. Bostick must become an atheist as a result of the experience.

▫ Insisting that if there was a God, he had failed to come to Ms. Bostick's rescue and would never come to her rescue.

▫ Altering the covert CCC technology to make it seem as though Ms. Bostick was disconnected from God, then communicating that she had been so disconnected, and making fun of her for her reactive despair.

▫ Using the covert CCC technology to represent to Ms. Bostick that she had been sold into the servitude of other horrifying gods.

▫ Attempting to convince Ms. Bostick that she had a god complex.

▫ Attempting to convince Ms. Bostick that she was, in fact, god herself.

▫ Attempting to convince Ms. Bostick that God was, in fact, a woman.

▫ Attempting to convince Ms. Bostick that her prayers had been intercepted and that God had never heard her prayers throughout her lifetime and did not know she was in peril.

▫ Attempting to convince Ms. Bostick that mediation was a sin that she was being punished for engaging in.

▫ Altering the covert CCC technology in order to prevent Ms. Bostick from being able to meditate.

◦ Attempting to convince Ms. Bostick that all of their religious communications and manipulations were symptoms of pregnancy, postpartum depression, and/or bipolar disorder.

◦ Alleging that the experience was the result of *falling* in love, thus she was falling in life since they decided that religious marriage held no bases in love.

◦ Yelling at Ms. Bostick not to breast feed every time she breast-fed her son for nearly six (6) months until she eventually could not endure it any longer.

◦ Using the covert CCC technology to make it feel as though the life was literally draining from Ms. Bostick's body every time she breast-fed, while yelling at her not to do it anymore.

◦ Insisting that Ms. Bostick had become Jesus and threatening to crucify her publicly and/or on a burning cross.

◦ Prohibiting Ms. Bostick from doing daily yoga, daily mediations, or any other inspiring daily action.

◦ Manipulating the covert CCC technology to make Ms. Bostick feel as though her spiritual gifts were being stolen from her.

◦ Forcing Ms. Bostick to steal, both by physical force through the covert CCC technology and via psychological manipulation and pressure, then attempting to punish her for doing so and/or preventing products from working effectively or at all.  Ms. Bostick had initially refused to engage in any such criminal act and it took years for them to break her down to the point where they could use such coercion and physical force through CCC such that they could use her thieving as a defense in this action and/or typecast her according to her perceived racial background.

- Deliberately trying to crush her faith in any higher power or in the Christian God in order to more easily access her psyche that they may break and kill her.

- Yelling at Ms. Bostick repetitively to kill herself.

- Attempting to convince Ms. Bostick that she was in hell on earth.

- Attempting to convince Ms. Bostick that the only way out of hell was to kill herself.

## Freedom of Speech

- Denying Ms. Bostick a public forum in which to defend herself.

- Attempting to prevent Ms. Bostick from filing this action.

- Attempting to control Plaintiffs' speech entirely and preventing the minor child from retaining any knowledge or skills based on his extensive time in speech therapy.

- Creating an environment where allegations as to Defendants fell on deaf ears and/or made people believe Ms. Bostick had a mental health illness.

- Insisting that Ms. Bostick was not allowed to be a civil rights attorney.

- Preventing Ms. Bostick from working in her legal practice.

- Attempting to convince Ms. Bostick that she had no right of free speech because they had made her into a piece of technology.

- Stealing Ms. Bostick creative thoughts and ideas in order to profit off of them themselves.

- Forcing Ms. Bostick to derive creative thoughts and ideas in order for them to steal.

71

▫ Attempting to silence Ms. Bostick by constantly nagging her to kill herself.

▫ Broadcasting Ms. Bostick's communications to audiences without permission.

▫ Using hate speech against Ms. Bostick, including calling her a nigger.

▫ Using the covert CCC technology to punish Ms. Bostick for thoughts of seeking assistance or attempts at securing assistance.

▫ Attempting to literally alter the sound of Ms. Bostick voice, both as to her inner and outer communications.

▫ Attempting to place personalities of other persons within the technology such that Plaintiffs would be forced to act, operate, and speak like other people, especially celebrities.

▫ Attempting to convince Ms. Bostick that Christina Bostick no longer existed and, therefore, was no longer in possession of a voice at all.

▫ Altering Plaintiffs' ability to sing, particularly when Defendants learned that the minor child was gifted with perfect pitch.

▫ Denying Ms. Bostick access to music.

▫ Hacking Ms. Bostick's computer and telephone, deleting communications and other information included thereon, stealing telephones and other electronic equipment necessary in order for her to prepare this Application and other documents, stealing information and documents in order that Defendants might profit off of Ms. Bostick's writing, and plagiarizing her writing.

▫ Attempting to force Ms. Bostick to write a book, fictionalizing the experience.

▫ Attempting to force Ms. Bostick to write a book instead of filing this action.

▫ Attempting to convince Ms. Bostick that she had not actually been the author of her own poetry.

▫ Using false interpretations of Ms. Bostick's creative works in an attempt to convince her that her stories had come to life or in attempt to falsify statements of truth inherent in her poems and using such false interpretations against her as admissions that she committed sins which could then be punished by Defendants.

▫ Coordinating with various law enforcement agencies, including, but not limited to the Howard County Police Department, the Federal Bureau of Investigations, and the Department of Justice to participate in refusing to allow Plaintiff Ms. Bostick to file a report and/or refusing to investigate allegations made by her.

▫ Influencing other persons not to hear Plaintiff Ms. Bostick or her son unless something was said three (3) times, including influencing her son not to listen, hear, and/or abide by his mother's instructions unless she gave such instruction three (3) times.

▫ Filing a lawsuit in order to obtain advance permission to engage in enslaving Plaintiff Ms. Bostick, using covert technology through the *Citizens United* action and, although aware that she was entitled to be a party to the action, failing to include her, serve her with process, and/or ensure her rights to be heard on the matter were realized at the time of the litigation; rather, she could only be *heard* during the *hearing* as a part of the unlawful experience.

▫ Breaking into Plaintiffs' home to destroy and damage her personal property, alleging to have done so because Defendants were jealous of her things and/or ability to decorate.

▫ Refusing and/or restricting Plaintiffs the ability to communicate by telephone.

▫ Refusing and/or restricting Plaintiffs ability to post to Instagram.

▫ Using the covert CCC technology to force Ms. Bostick to participate in therapy within the virtual experience and reveal personal information and matters regarding her life in order to rely upon such information to inflict further torture upon her.

### Freedom of the Press

▫ Deliberately making it impossible for Ms. Bostick to contact the press regarding the experience.

▫ Operating covertly such that the press had no access to the events occurring as a result of the CCC technology, nor the CCC technology (or use of the) itself.

▫ Punishing her for an article published in the Washington Post about her work as counsel for the Family of Henrietta Lacks.  *See* **Exhibit R**.

▫ Attempting to thwart her work regarding Henrietta Lacks so as not to "muddy the waters" as to overturning *Roe v. Wade*.  *See id.*

### Right to Petition the Government for Redress of Grievances

▫ Making efforts to prevent and/or delay the filing of this action.

▫ Denying her clients, a right to petition the government for redress of grievance by conspiring with the Maryland Judiciary and the Virginia Judiciary regarding a joint effort to force her to lose each of her cases; by preventing her from working on those cases; and, illegally accessing her personal computer to delete her clients as parties to this action.

· ***Defendants violated the Second Amendment to the U.S. Constitution*** by putting Plaintiffs in such dire conditions and threatening her life so often as to place Ms. Bostick in a position to consider purchasing a gun, refusing to allow her to purchase a gun, and placing her in fear of purchasing a gun by convincing her that having a

gun would result in her becoming a serial killer or otherwise unlawfully killing other persons.

· ***Defendants violated the Third Amendment to the U.S. Constitution*** by using the covert CCC technology to quarter government agents and other persons in her home as if to be a militia or other military personnel intended to regulate and control her behavior against her will and without her consent.

· ***Defendants violated the Fourth Amendment to the U.S. Constitution*** by repetitively breaking in her home upon her brief exits in order to remove her personal belongings, destroy such belongings, or alter conditions in her home to her detriment (e.g. breaking the toilet such that it no longer flushed and removing the tile from the shower so that she was forced to share a bathroom with her minor son) and further by conspiring to prevent the Howard County Police Department from investigating her allegations of such break-ins then, when police officers ran from her home as they refused to assign a detective her case, leaving their notebook behind in the process of running out of Ms. Bostick's home, executing a search warrant on her home after being instructed by the captain to have a detective contact her and not to execute such search warrant – they used a key to gain entry to her home at that time. Further, Defendants accessed Plaintiffs' home at their leisure, using a duplicated key and accessed her car at their leisure using a stolen car key.

· ***Defendants violated the Fifth Amendment to the U.S. Constitution*** by punishing her on an ongoing basis for the same offense over the course of what is nearly eight (8) years without ever bringing a legitimate action in a public forum, nor ever proving a case during the course of the experience via their covert CCC technology such that there was a complete denial of due process as to Ms. Bostick.

· ***Defendants violated the Sixth Amendment to the U.S. Constitution*** by punishing Ms. Bostick on an ongoing basis for the same offense over the course of what is nearly eight (8) years without ever bringing a legitimate action in a public forum, nor ever proving a case during the course of the experience via their covert CCC technology

such that there was a complete denial of a speedy, public trial, by an impartial jury and further involving other States and out-of-state citizens to participate in the virtual trial they held using their covert CCC technology such that proceedings were not solely heard by the State wherein the crime was alleged to have been committed, nor she permitted a compulsory process for obtaining witnesses in her favor, nor the assistance of counsel for a defense.

· ***Defendants violated the Seventh Amendment to the U.S. Constitution*** by denying Plaintiff Ms. Bostick a trial by jury.

· ***Defendants violated the Eighth Amendment to the U.S. Constitution*** by engaging in cruel and unusual punishments as to Plaintiff Ms. Bostick and denying her an opportunity for bail, rendering bail inherently excessive and further by using the government of the State of Maryland to impose speeding tickets on her which resulted from using the covert CCC technology to force her to speed through monitored areas and through red lights.

· ***Defendants violated the Nineth Amendment to the U.S. Constitution*** by relying upon the presumed rights of Defendants in order to deny and/or disparage Plaintiffs' rights, namely Defendants presumed their collective freedoms as to religion eclipsed Plaintiffs' identically-afforded rights.

· ***Defendants violated the Eleventh Amendment to the U.S. Constitution*** by commencing a pseudo-legal action and/or prosecution against Ms. Bostick in various States in which she is not a citizen and further by conspiring to hold her accountable for a traffic-related incident that occurred during her college tenure in the State of Georgia so that they could prosecute her twice:  once in the State of Georgia and then in the State of Maryland on and ongoing bases since there exists no reciprocity between the States and she would never receive a hearing in Maryland in order that she might offer a credible defense which might have the effect of preventing them from inflicting punishment as to her on an ongoing basis.

· ***Defendants violated the Twelfth Amendment to the U.S. Constitution*** by coordinating an effort to choose future presidents on the bases of Ms. Bostick's political interest and expertise, holding an ongoing electioneering communication in order to arrive at choices for such candidates and/or for the elimination of such choices, and then planning to rig future elections in their own and against her interest and further by denying her the right to run for the office of president and eliminating her as an elected judge after refusing to allow her the opportunity to campaign for such office or to adhere to the rules governing such election and then refusing to allow her name to appear on the ballot during the general election after winning the primary.

· ***Defendants violated the Thirteenth Amendment to the U.S. Constitution*** by using covert technology to force Plaintiff Ms. Bostick and her minor son into slavery and/or involuntary servitude, forcing her to work and/or preventing her from working, refusing to allow her to earn an income, using the Willie Lynch letter/book as the bases for constructing a strategy as to how to force her into such slavery or involuntary servitude. *See* **Exhibit D**.

· ***Defendants violated the Fourteenth Amendment to the U.S. Constitution*** by insisting that Ms. Bostick was not a legitimate citizen of the State of Maryland and deliberately abridging Plaintiffs' privileges, rights, freedoms, and immunities in full awareness that Plaintiffs were, at least, American citizens and further by depriving Plaintiffs of life, liberty, and property without due process of law and/or equal protection under the law when they engaged in conduct which included, but was not limited to:

  ▫ Forcing Ms. Bostick's minor son's enrollment in Howard County Public School's Early Intervention program ("HCPSS Early Intervention"); programming him with new covert CCC technology; refusing to provide a speech therapist as a part of his enrollment; remaining active in his upbringing after Plaintiff Ms. Bostick terminated the relationship with Early Intervention after it refused to provide him with a speech therapist; and using the new covert CCC technology to impair the minor child from learning, developing speech, as well as other modes of delaying his development,

intentionally to the detriment of both Plaintiffs and in order to frustrate Ms. Bostick's parenting of the minor child for as long as possible from the time of his birth to the time he turned seven in order to thwart her efforts at instilling proper values in him during that time such that it would become more difficult to instill such values (including religious values) based on various studies, Plaintiffs' religion, and their own family's advice that the same should be done in the first seven (7) years of a child's life.

◦ Denying Plaintiffs access to proper childcare and depriving whatever daycare the minor child was enrolled at of any conceivable tool possible of being so denied as to him specifically in order to abuse and mistreat the minor child while outside of his mother's supervision.

◦ Forcing the minor child's unenrollment at childcare centers and schools on the bases of his color or on the bases of other prejudices in order to prevent him from receiving any early education or childcare at all because it  which exceeded the costs they believed Plaintiff Ms. Bostick should be able to afford as a black woman forced to be a single mother, even though that she did exists as a single mother was the intended result of Defendants collective conduct and/or participation in a "slavery game."

◦ Coordinating with the minor child's childcare providers to disenroll him, mistreat him and/or mistreat and/or overburden Plaintiff Ms. Bostick as a punishment for attempting to be anything more than a *welfare queen* and single mother.

◦ Attempting to prevent the minor child's enrollment in Howard County Public Schools by thwarting his mother's effort to register him, purchase school supplies, purchase other items necessary for him to begin his primary education, and terrify Plaintiff Ms. Bostick about what potential harm may come to him as a black student at a premier, majority white Howard County Public School.

▫ Attempting to force Plaintiff Ms. Bostick to register the minor child to attend the Howard County Public School that his grandmother's address fed to in order to prevent his attendance at Clarksville Elementary School contrary to the new busing policy enacted in order to increase diversity in majority white neighborhoods as well as majority minority neighborhoods, both of which were previously prevalent the county.

▫ Preventing Plaintiff Ms. Bostick from earning enough income to pay her rent and/or from timely paying her rent such that she would either be evicted, or her lease would not be renewed, and she would be forced to relocate outside of her present neighborhood and into a neighborhood that did not feed to Clarksville Elementary School, ultimately fraudulently securing a court ordered dispossession of her rental property by preventing her from showing up to any of three (3) hearings by use of the covert CCC technology, including manipulating the scheduling of one such hearing so that she would show up after the hearing concluded even though she was on time and the Court called the case an hour earlier than it was initially scheduled for.

▫ Increasing break-ins and coordinating with local law enforcement to refuse to investigate such break-ins and other criminal violations Ms. Bostick reported in order to scare her out of the neighborhood and prevent her son from attending Clarksville Elementary School.

▫ Coordinating with the rental property where she presently resides in order to arrange and engage in severe and horrifying depictions of projective imagery within the confines of her home in order that they might scare her out of the neighborhood and prevent her son from attending Clarksville Elementary School.

▫ Refusing to allow Plaintiff Ms. Bostick to enroll the minor child to attend school at Clarksville Elementary School and further refusing to allow her participation in dropping him off at school on the first day under the threat of

refusing to receive him as a student if she did attempt to participate, forcing the minor child's father to take him to school on the first day in her stead.

◦ Registering the minor child to attend Clarksville Elementary School themselves instead of allowing Plaintiff Ms. Bostick to register him with the intent to communicate its refusal to recognize her as a parent who was responsible for him or his welfare and threaten to make him a ward of the State to be raised by privileged white persons in the future.

◦ Filing a bogus report with child protective services instead of investigating the crimes she reported in effort to delegitimize Plaintiff Ms. Bostick's claims of harassment or other crimes effectuated against her and assume full responsibility for the minor child, in an attempt to further deprive her of her rights as a parent.

◦ Refusing to permit the minor child's birth certificate to reflect his father's name.

◦ Using the covert CCC technology in order to refuse to allow Ms. Bostick to review the papers sent home by the minor child's elementary school.

◦ Refusing her access to the minor child's classroom on the absurd basis that the teacher's bargaining agreement required twenty-four (24) hour notice of a parent's intended access to the classroom (which fails to comport with Howard County Public School Policy) and planning to so refuse her access as soon as she determined that such access was mandated as a part of her representation of Howard County parents with complaints about the treatment of their children and/or of themselves by their children's respective schools; Ms. Bostick first learned of the mandatory access policy several years ago.

◦ Attempting to discourage her from having any faith in Clarksville Elementary School by ensuring that her son was neither able to ride the bus to school on the first day, nor take the bus home; rather, the child's father had to drive

him to school, then HCPSS intentionally placed the child on a different bus which attempted to drop him off at their old neighborhood, located in an area that represented a lower income bracket, ultimately forcing the child to return to school and wait for a parent to pick him up from the school.  In engaging in this activity, Defendants also intended for the minor child to be afraid of taking the bus in order to deny the family access to public school transportation and to employ the child's father (w/o pay) as the lead trainer for the staff as to any similar potential situation.

▫ Forcing Plaintiff Ms. Bostick and her family members into difficult, compromising, discriminatory, extreme circumstances with various government employees in order to allow such government employees access to superior training and, in doing so, force Ms. Bostick and her family members to train those employees themselves without pay with the additional intent of forcing the employee to out argue Ms. Bostick and/or her family members in order that they should be denied any redress on the basis of their complaint or concern (e.g. forcing the minor child's father to oversee and administer all follow up necessary in response to the minor child being placed on the incorrect bus).

▫ Coordinating with various law enforcement agencies in order that Ms. Bostick would be deprived of any assistance by such law enforcement, including the Howard County Police Department, the Howard County State's Attorney, the Federal Bureau of Investigation in Maryland, and the Department of Justice.

▫ Outrightly denying Ms. Bostick equal protection under the laws.

▫ Attempting to steal Ms. Bostick's businesses and/or business ideas by refusing to allow her to renew the license for those businesses or otherwise refusing to allow her to participate in the erection and/or execution of necessary tasks as to such businesses.

▫ Preventing Ms. Bostick from making an income.

▫ Preventing Ms. Bostick from succeeding in any litigation where the fee structure was based on a contingency.

▫ Programming the minor child to behave contrary to Ms. Bostick parenting and his upbringing.

▫ Breaking Plaintiffs' home to steal their possessions and destroy its arrangement.

▫ Breaking down a rental home for fear that Defendants' might get caught tormenting Plaintiffs in that particular neighborhood because how the homes were arranged and further because Plaintiffs were somewhat secluded within the context of that community.

▫ Breaking down a rental home because Ms. Bostick had too much yard space.

▫ Denying Ms. Bostick the ability or opportunity to own any property, real or tangible.

▫ Breaking into Ms. Bostick trust account in an attempt to have Ms. Bostick bar license taken and her practice investigated.

▫ Hacking her financial accounts and credit cards to prevent Ms. Bostick from using them.

▫ Forcing Ms. Bostick to purchase a vehicle, then preventing her from earning income so that they could repossess the car.

▫ Alienating Ms. Bostick from family and friends, particularly Ms. Botsick's mother and Her minor son's father.

▫ Insisting that Ms. Bostick was a slave and then punishing her for refusing to acquiesce to that perspective and for insisting instead that if they thought her a slave then they were slaves themselves; thereafter, Defendants insisted that

Ms. Bostick was a slave master and that whatever she thought was a command order that they would have to follow (i.e. I am so tired, so they manipulated the covert technology to make her more tired).

▫ Insisting that Ms. Bostick kill herself.

▫ Insisting that Ms. Bostick remain in her house at all times.

▫ Conspiring with the management office or other management/ownership at Plaintiffs' current residence to allow them access to her home in order that they might gaslight her into believing she was mentally ill to prevent her from filing this action at all or credibly filing this action.

▫ Denying Ms. Bostick the ability to exercise.

▫ Denying Ms. Bostick the ability to spend time in nature.

▫ Preventing Ms. Bostick from attending the funerals of her close family and friends.

▫ Using Ms. Bostick's grief in the wake of the death of her relatives to attempt to completely derail her life and professional reputation.

▫ Forcing Ms. Bostick to smoke cigarettes, deliberately raising cigarette prices simply to target her with an additional tax and make her life more difficult, then daily harassing her for smoking such cigarettes which she was forced to smoke in accordance with the programming and operation of Defendants' covert technology in order that they might rationalize her enslavement to potential new participants on the basis of the smoking and further by associating the smoking of tobacco with the harvesting of it by slave labor prior to the emancipation of American slaves.

·   ***Defendants violated the Fifteenth Amendment to the U.S. Constitution*** by denying Ms. Bostick an opportunity to vote for herself, nor at all in the 2022 primary election on the bases of her race.

·   ***Defendants violated the Nineteenth Amendment to the U.S. Constitution*** by  denying Ms. Bostick an opportunity to vote for herself, nor at all in the 2022 primary election on the bases of her gender.

·   ***Defendants violated the Twentieth Amendment to the U.S. Constitution*** by refusing to acknowledge the election of Joseph Biden as the 46th President of the United States and by purporting to be constituents of President Trump while insisting that she be tortured as both herself and as Michelle Obama since President Obama remained the only black President (and, therefore, Ms. Bostick's President) but refusing to acknowledge him as their president because he was *merely* a *black* President.

·   ***Defendants violated the Twenty-Second Amendment to the U.S. Constitution*** by insisting that Presidents Obama and Trump remained in their office in perpetuity.

·   ***Defendants violated the Twenty-Fourth Amendment to the U.S. Constitution*** by refusing to allow Ms. Bostick to campaign for office and further refusing to permit her to adhere to the election rules, charging her with fees for failing to so adhere, and denying her an opportunity to vote for herself or at all in the 2022 primary election because she failed to pay a fine they intentionally prevented her from being aware of; then, despite paying said fine, insisting that if she failed to go through several steps they only created in order that she be forced to humble herself to them in shame by submitting her name to the Democratic Committee for Howard County as a candidate to replace herself as the elected candidate under their approval, that she would not be on the ballot for the general election, then refusing to allow her to go through those steps.

·   ***Defendants violated the Twenty-Sixth Amendment to the U.S. Constitution*** by denying her an opportunity to vote her for herself and further denying her an opportunity to

vote at all in the 2022 primary election on the bases of her age despite the fact that she was at least eighteen (18) years old at the time of the election.

Then, on September 20, 2022, just as Plaintiff Ms. Bostick was completing a draft of the immediate Application, a member of Mt. Pisgah A.M.E. Church (the "Church Member") joined the covert CCC communication, misrepresenting herself as an official of the Supreme Court. During her communication, she toggled a switch that significantly canceled out all noise related to the CCC and seemingly cut the power entirely. Thereafter, she flipped the switch to reinstate the power, while simultaneously increasing the volume. Over Ms. Bostick's (and several of the other participants') objections, the Church Member insisted that the CCC would continue and admitted to having been in possession of the ability, as well as and the authority to end the CCC entirely. The Church Member further insisted that despite being able to terminate the communication, and despite having been in possession of both the ability and the authority to do so since the initial stages of the connection to Plaintiffs, she had not disconnected the CCC communication because Ms. Bostick was being punished and had to earn her right to become a Christian. Additionally, she refused to disconnect the CCC communication unless Michelle Obama instructed her to do so and purported to be working under the leadership of Michelle Obama. Even now (on September 20, 2022, as Ms. Bostick is working on this Application), the Church Member remains active on the CCC communication (as do several of the other Defendants named hereto), listening to whatever Ms. Bostick types in furtherance of this action. The Church Member refuses to toggle the switch again and shut the CCC down short of this Courts intervention because someone promised her that she would reap a financial benefit as a result of her participation in the incident and further because she does not believe she

should suffer any consequences as to her participation—if Ms. Bostick has been made to suffer already, why should anyone else have to suffer; rather, her perspective is that Ms. Bostick should die on behalf of the sins of all of the Defendants.  Finally, the Church Member admitted to misrepresenting herself as another individual during the entirety of the CCC as a means by which to conceal her identity during any such time that she decided to directly torture Ms. Bostick and/or her minor son.

IX.  **ARGUMENT**

### A. Plaintiffs are Entitled to an Emergency Preliminary Injunction.

In order to secure a preliminary injunction, a plaintiff must show (1) a likelihood of success on the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; (4) reasonable diligence; and (5) that an injunction is in the public interest.  *See Benisek v. Lamone,* 138 S.Ct. 1942, 1943–45 (U.S.Md., 2018).  As discussed in more depth below, Plaintiffs' current status as the captive subject of an ongoing "Slavery Game," coordinated between and bridged for participation across several States, violates the Constitutional Rights afforded to her by various clauses of and amendments to the U.S. Constitution and presents an extraordinarily pressing need for immediate, emergent, equitable relief which warrants Federal and Judicial intervention into a State-based activity.  As such, Plaintiffs are entitled to the Issuance of a Preliminary Injunction:

1.  <u>Plaintiffs Are Likely to Succeed on the Merits of this Action.</u>

Given the extremity of the facts and circumstances articulated herein, as well as overwhelming supporting evidence, Plaintiffs are likely to succeed in any proceeding on the merits of this action.  *See* Section VII, Statement of the Case (*supra*).  *See also* Section VIII,

Statement of Facts and Relevant Historical Background (*supra*); Statements of Facts and Historical Background as set forth in Plaintiffs' Complaint (*pending filing*).  The following analysis further speaks to the strength of Plaintiffs' case and Defendants' lack of a credible defense as to the same:

Defendant States and their co-Defendants deliberately acted so as to deprive Plaintiffs of their Constitutionally-guaranteed rights and/or other rights afforded to them as American citizens and/or citizens of the State of Maryland.  Where the actions of a State and/or a State government is the direct cause of a deprivation of one's Constitutional rights, that State is not only culpable as to its actions which led to the deprivation or were carried out with the intent to do so, but such actions, in fact, represent the root cause of the deprivation.  *See Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 117 S.Ct. 1382, 1394, 520 U.S. 397, 415–16 (U.S. (Tex.) 1997).  Where, as here, Plaintiffs allege facts which demonstrate that such deliberate steps were, in fact, taken by the Defendant States—both knowingly and with the specific intent to deprive Plaintiffs of her Constitutional rights— and where State officials did, themselves, participate in acts which so deprived Plaintiffs, a case brought on the bases of those acts is not only credible, but also meritorious.  *See id.* Thus, articulated facts which demonstrate such a deliberate deprivation far exceed the bear minimum threshold necessary for a plaintiff to succeed on the merits of any such action, particularly upon the filing of an application whereby such plaintiff requests emergency injunction relief.  *See id.*

Indeed, the facts articulated herein demonstrate that not only were the officials of the Defendant States aware of the deliberate actions taken against Plaintiff, but that government officials actively participated in the implementation of such acts, thereby

resulting in their respective governments and the government entities within them being named as Defendants in this action.  As a result, even if such government officials attempted to defend against Plaintiffs' allegations by claiming not to have  participated in steps taken to intentionally deprive Plaintiffs of their constitutionally-guaranteed rights, freedoms, privileges and immunities, such a defense would certainly fall far short of either a credible or meritorious defense.  *See id.*  Rather, their attempted defense would establish that the participating officials associated with the Defendant governments and government entities operated to Plaintiffs detriment with a conscious disregarded as to the high likelihood that their co-Defendants' actions—namely placing Plaintiffs in a position of forced servitude from which she was incapable of escaping—would entirely deprive Plaintiffs of all of their rights under the State constitutions and/or the United States Constitution.  *See id.*

Furthermore, Plaintiffs allege that nearly all (if not all) of her white neighbors within the geographic location identified as Howard County, Maryland were extended advanced notice as to Plaintiff Ms. Bostick's intended condition of servitude and offered an opportunity to participate in the same.  The vast majority of persons who received such an offer did, in fact participate, with particular emphasis on those neighbors who reside in the City of Clarksville which falls within the boundaries of Howard County.  Neighbors who participated in that "game" also participated in the planning process as to the administration of the same, including determining, communicating and administering the steps necessary to carry out their collective intent to enslave Ms. Bostick.  Abhorrently, their scheme was (at its origins) based on already well-thought out steps which were reduced to writing and entitled *The Willie Lynch Letter*.  *See* **Exhibit D**.  *See also* Section VII, Statement of the Case (*supra*).  In accordance with those instructions, Defendants determined that it

would be necessary for Plaintiff Ms. Bostick to have a child outside of wedlock.  Defendants then engaged in a plan to ensure that she would, in fact, have a child out of wedlock and that she would not marry during the pendency of her pregnancy or at any time thereafter.

There is also substantial evidence that, not only did the Defendant States and other co-Defendants execute a similar scheme upon Ms. Bostick's grandparents, but that their earlier contrived design arose in relation to and in conjunction with her grandmother's participation in an organization formerly known as The Worldwide Church of God (the "WWCG" or the "Cult") which is now known as Grace Church and a Defendant named as a part of this action.  At the time of Plaintiff Ms. Bostick's birth, both she and her parents were members of  the WWCG which was determined to be a cult when she was approximately nine (9) years old.  At that time, her grandmother had been a member of the WWCG for nearly forty (40) years and held a position of honor within its ranks; however, as a deaconess she was extended no authority and was not privy to information, but was, in fact, known globally throughout the vast church community.

By way of some background, in 1933 Herbert W. Armstrong ("Armstrong") founded WWCG which was then known as the Radio Church of God.  When Armstrong died in or about 1986, Joseph W. Tkach ("Tkach, Sr.") was appointed as its new leader.  During Tkach, Sr.'s tenure, the Cult went through radical changes, allegedly in attempt to bring it into more modern and conventional religious beliefs, including, but not limited to eliminating strict enforcement as to the observation of the sabbath; accepting the previously denied doctrine of the "Trinity;" and promoting reliance upon both the Old and New Testaments instead of enforcing religious reliance solely upon the Old Testament.  Tkach, Sr.'s attempt to reform the Cult's doctrine led to mass dissent and abandonment of it by its previous

membership which dropped from over Eight (8) Million persons from every corner of the globe to less than 50,000.  In 1995, Joseph Tkach, Jr. ("Tkach, Jr.") assumed leadership of the Cult from his father, Tkach, Sr., pursuing the reformation by continuing to implement religious doctrine based on salvation through grace and faith.  In 2009, the Cult changed its name from the Worldwide Church of God to Grace Communion International ("Grace Church"), now commonly known as Grace Church.  It was during that time period that WWCG seems to have led its minority members to believe that the church was closing its doors; however, it maintained its white membership throughout that ten-year period and into its quite resurrection as Grace Church.  Now, Grace Church has approximately 30,000 members in 550 churches which are located in at least seventy (70) individual countries, and which is (probably not coincidentally) headquartered in Howard County, Maryland.[20] It follows that not long after Plaintiff Ms. Bostick's birth in 1985, she was placed on the same (or an improved version of the same) CCC technology as her grandparents.[21]  It was also around that time that the initially-involved Defendants began planning to carry out a sorted plot against Ms. Bostick and her family members.

Although, over the course of her life, other nefarious activity was carried out against Plaintiff Ms. Bostick, it was not until she left her employment at Defendant Shulman Rogers that her life experience begins to reveal Defendants' clear intent to place her at the center

---

[20] Its predecessor, the Worldwide Church of God was originally founded in Pasadena, CA and relocated to North Carolina, but its role as to the "slavery game" herein described required it to operate directly from Columbia, Maryland.  It therefore moved a significant measure of its operations to Howard County.

[21] Interesting, Ms. Bostick was a full month late at the time of her birth because she had flipped around such that she was no longer properly situated for a vaginal birth.  As such, her mother was finally scheduled for a cesarean section exactly thirty (30) days after her initial delivery date, during which time she Washington Seventh-Day Adventist Hospital (or Washington Adventist Hospital) allegedly administered anesthesia which entirely failed; accordingly, Ms. Bostick's mother was forced to undergo the entire cesarean procedure without being anesthetized at all.

of a "slavery game."   Thereafter, Defendants interfered in the marriage of Plaintiff Ms. Bostick's parents, forcing them to hastily divorce which provided them with greater access to Ms. Bostick since, from their perspective, she was no longer protected from trespass or other adulteration by the religious marriage of her parents.   As a part of that hasty divorce, Ms. Bostick's parents were forced to remortgage a home they previously owned outright. Thereafter, Ms. Bostick was unable to find equally lucrative employment.   As a result, of both her parents' divorce and her inability to secure appropriately gainful employment according to the combination of her legal degree and significant legal experience, Ms. Bostick was forced to return to her childhood home and reside with her mother who did, in fact, require her assistance in the aftermath of what proved to be a difficult divorce.   Then, Defendants involved themselves in Ms. Bostick's family by silently inundating them with manipulative technology, manipulating them against Plaintiff Ms. Bostick, and effectuating her eviction from her mother's home not long after the minor child's first birthday.  The plan to evict her was long intended as evidenced by the repetitive daily chants yelled at her through the covert CCC technology:  "get out of the neighborhood!"

Once Ms. Bostick was no longer a resident in her mother's home, Defendants interpreted her absence as permission to lodge a full-on attack on her mother in an attempt to preempt and undercut any potential efforts by her to aide Plaintiff Ms. Bostick when they re-directed their focus to completely ruining Ms. Bostick.  While she resided in her mother's home, she was able to bear the brunt of the attack, but her absence from the initial battlefield combined with the overall absence of her grandmother following her death allowed them to use the grief derived therefrom to break the remaining familial bonds. Then, Defendants coordinated and engaged in a full-on assault as to Plaintiff Ms. Bostick's

mother's career, forcing her to progressively earn less and less income as she bounced around from job to job despite her previous reputation of leadership, excellence, and increasingly high esteem within her field.

As a result, Ms. Bostick's mother was forced to put her home on the market and relocate to a smaller home in a neighborhood districted for a far more diverse elementary school, located outside of Clarksville.  However, not long thereafter the Superintendent of Howard County Public Schools designed and implemented a bussing policy intended to diversify the populations at both almost entirely white schools and majority minority schools.  The Superintendent's policies faced overtly  racist objections from Howard County citizens.  *See* **Exhibit S**.  Unbeknownst to her, after Defendants rental home was ruined as a result of Defendants intentional efforts to remove her from a community that would not welcome the use of their CCC technology as a means to attack their close neighbor, as well as Defendants collective concern that, in addition to the solitude the home offered, the luxuriously spacious yard also afforded Plaintiff Ms. Bostick and her son to much freedom, Plaintiffs were forced to relocate to a community located directly across the street from the Howard County Board of Education building.  Unfortunately (or perhaps well-situated within their long-term plans as to Plaintiffs) the Superintendent's plan districted to attend Clarksville Elementary School.

Plaintiffs resided at Defendant Ashton Green for nearly a year before Ms. Bostick began drafting the immediate Application.  In order to prevent her from being able to file the motion, Defendant Ashton Green and their co-Defendants began a concerted effort to deprive her of resources and/or income such that she would fall into a state of poverty and be unable to afford to file such an action.  As a part of those efforts, Defendants easily pivoted

to focus on evicting Ms. Bostick such that her minor child could not begin his primary education at Clarksville Elementary School and Ms. Bostick's attempts to file this action would be further frustrated given that she would (1) be yet again in the process of being forced to relocate; (2) since she did would not timely know where she would next reside, she would be unable to register her son to begin kindergarten with his proper peer group; and (3) could be cited for failing to timely register him, placing him at risk of being removed from her home by Howard County and/or the State of Maryland.  From Defendants perspective, they left Ms. Bostick with only one option which would also secure them an opportunity to remove the minor child from Plaintiff Ms. Bostick's control and custody—her mother could timely register her for school if Ms. Bostick granted her a guardianship of the minor child. With the minor child under the guardianship of his maternal grandmother, Ms. Bostick would have given up the bulk of her legal rights as to him.  Defendants desired the guardianship because it would place the minor under identical conditions as Ms. Bostick at the time of her birth, enabling them to play the same "slavery game" in reliance upon the minor child.  Further, the minor child would be outside of his mother watch, control and influence; his mother would be discredited, displaced, and disempowered to effect any change as to him or any of her other family members; and she would therefore lack any access to a meaningful legal remedy, particularly if such remedy was south in Howard County, Maryland or in the State of Maryland, generally.  They would all be stuck within the boundaries of that State, and further buried underneath the weight of Defendants' collective intent to enslave the entire posterity of the family without ever being able to overcome the intentional deprivation of their rights or could no longer reproduce.

Given that the aforestated narrative (which does not represent a full accounting of the events suffered by Plaintiff on the bases of Defendants' deliberate actions or their insistence that she be the subject slave in their "slavery game") it should not surprise the Court that Defendants placed a large, audible horn in the park across the street from her current residence; the alarm only sounds at times when a global announcement is made using Defendants' covert CCC technology and a countywide speaker system.[22] By sounding the horn, Defendants are able to prevent Plaintiff Ms. Bostick from hearing any announcements made on the speaker system while allowing other neighborhood participants to collectively be informed.   Such ongoings could not have occurred but for the involvement of the Howard County government, nor short of the Maryland State government at least being on notice as to the same.   However, Plaintiffs allege that, not only were Maryland officials aware of the events herein alleged, but that they fully participated in those events, including persons alleging to be the governor of Maryland and/or his wife.

Defendants are comprised of individual persons, businesses entities, organizations, cities, governments, government entities, as well as States, including, but not limited to the State of Maryland.[23] *See* Section II, Parties (*supra*).   Interestingly, her joint involvement is also related to a covert scheme, designed to prevent Plaintiff Ms. Bostick from being recruited to the cast of the Real Housewives of Potomac and/or from being cast in a new show which would have presumably been entitled the Real Housewives of Howard County. In fact, the "slavery game" itself is related to the Real Housewives franchise since the

---

[22] Defendants alleged that the speaker system belonged to Defendant Worldwide Church of God and, therefore, may have a larger reach than herein articulated.

[23] This list is not comprehensive, but merely illustrative of the type of Defendants who are included as named parties hereto.

technology was developed using the franchise as a basis such that instead of airing a show depicting several women in housewife scenarios, Defendants could place one (1) woman, specifically the Plaintiff Ms. Bostick, on a reality show of essentially the same subject matter, but by herself and force her into becoming a *desperate* housewife."   In their planning for that reality show, Defendants deliberately cast a Real Housewives show in every State that agreed to participate in the "slavery game" or otherwise applied to participate in the "slavery game" after it had begun.   As such, there may not yet be a show cast in all of the States named as parties to this action.

Given the extent of the planning that went into the events alleged herein, as well as the details attributable to the events themselves, Plaintiffs are, in fact, likely to succeed on the merits of this action by proving that she, her son, her clients, as well as her friends and family were intentionally and deliberately deprived of the full extent of protections guaranteed to them by the United States Constitution and by further establishing the participation in those events by government officials in each of the States named as Defendants hereto.   Thus, Defendants unconstitutionally created government policy and/or custom which amounted to <u>official</u> government policy and insisted that Plaintiff be injured as a result of those official policies, up to and including her death—whether by her own hand, by a Defendant's hand in reliance upon measures that could be taken using the covert CCC technology as a lethal weapon, or by whatever other means could be orchestrated in the more commonly experienced natu8ral world. *See Brown*, 520 U.S. 397, 417 (U.S. (Tex.) 1997).   Finding the first two (2) options impossible, Defendants attempted to convince one (1) of the other Defendants to effectuate a homicide which they promised not to investigate or otherwise penalize.

After years of representing the participants as angel and/or demon spirits, or as the Holy Spirit itself, Defendants hired programmers in an attempt to create extraordinary hostile circumstances which would almost certainly force Plaintiff Ms. Bostick into insanity or suicide; however, hiring the programmers allowed the majority of Defendants to take a break from communicating through their covert CCC technology.  Left to their own devices, the programmers interacted with Plaintiff Ms. Bostick and not only became acquainted with her, but felt compelled to comfort her and investigate the true purpose of the persons who hired them to execute a harsh program upon another human being.  As a result of those efforts, the programmers confessed to Plaintiff Ms. Bostick that they were, in fact human beings and revealed themselves as such, rather than engaging in the behavior Ms. Bostick experienced as torture.  The programmers also informed Ms. Bostick as to the identities of specific persons who hired them, namely Buescher and Ms. Bostick's former high school classmates.  Then, they described in detail the circumstances of their employment and their understanding regarding the intent of their employers.

By the time Defendants returned to the covert CCC technological communication system, they had long rested and were capable of resuming their direct efforts to torture Ms. Bostick which they did over the objection of the programmers.  At that time, Plaintiff Ms. Bostick revealed to Defendants that she was now aware that they were actually human beings and, as such, directly engaged in making her suffer incessantly.  In response, Defendants first attempted to convince Plaintiff Ms. Bostick that she was incorrect and did, in fact, suffer from a mental health condition.  Then they played out storylines which stuck to scripts that were religious in nature and therefore more emblematic of bipolar symptoms than their previous interactions with her.  However, by then, the technology had been

reprogrammed to represent Defendants as clearly human and, further, to prohibit any use of a virtual cloak which might be employed in order to mask the participants as spiritual or otherworldly.

Now, equipped with the knowledge and awareness that what Defendant medical professionals had convinced her were the harsh psychological effects commonly associated with the loss of a pregnancy immediately prior to again conceiving, her now five-year-old son, bringing a pregnancy to term, post-partum depression, and/or the lingering effects thereof had actually been communicated to her in concert with Defendants and only as a means by which  to manipulate and disorient her during the pendency of the "slavery game." Thereafter, Ms. Bostick took greater stock in the advice and opinions communicated to her by subsequent medical professionals:  she had, in fact, been incorrectly diagnosed. Thereafter, Plaintiff Ms. Bostick advised Defendants that her conditions were dire, extreme, and characteristic of historic slavery which rendered the exercise entirely illegal—so much so that she intended to file this action with the Supreme Court.  Immediately, Ms. Bostick began to research and draft the necessary documents to do so.  Both in effort to prevent the filing of such an action; in order to continue on with their "slavery game;" and in effort to put Plaintiff Ms. Bostick *in her place*, Defendants plowed ahead with renewed plans to manipulate her into committing suicide or using the covert CCC technology to cover up what they hoped would be her intentional death by use of the technology itself.

Even if this Court were to consider the Defendant States' actions as having been so private as to amount to a failure to announce that the enslavement of Ms. Bostick was, in fact, government policy; neither their active participation, nor their status as known government official can be ignored.  Thus, any characterization of their actions as private

does not change the fact that in so acting, the Defendant States did circumvent and violate the U.S. Constitution.  To the extent government agents maintained confidences because they were under the impression that the unconstitutional intentions of responsible parties would only occur once and, therefore, did not amount to reliable policy, they are neither individually, nor as agents of the Defendant States, absolved of culpability.  In fact, according to *Brown*,

> [i]t does not matter that the policymaker may have chosen a course of action tailored [only] to a particular situation and not intended to control decisions in later situations, if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, it surely represents an act of official government policy and the [participant state government] is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*See id.*, at 417-419 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)).  Thereafter, as to government officials who failed to act affirmatively, or at all, but who were in possession of knowledge as to the extent to which citizens of their respective states did participate in the "slavery game" discussed herein and failed to take any action, "the policymake[r] . . . can reasonably be said to have been deliberately indifferent to the need [to take action]" because the need to do so was "so obvious."  *See Crawford-El v. Britton*, 118 S.Ct. 1584, 1592, 523 U.S. 574, 588–89 (U.S.Dist.Col.,1998).  Under the law, deliberate indifference is treated as it is elsewhere in the law—as tantamount to intent, so that inaction by a deliberately indifferent policymaker when faced with a clearly substantial risk of harm as to a protected individual is equivalent to the intentional action itself.  *See id.*

98

Additionally, in contemplating any potential defense that could be offered as to Plaintiffs' allegations, it is important to consider the egregious nature of the acts so alleged. Ultimately, Defendants acted with such willful disregard for Plaintiffs' Constitutional rights that the mere decision not to act to protect them also renders their respective State of domicile and/or employment to amount to a secession from Union and, therefore, treason. To Defendants, that one woman could thwart their contrived plan of secession, *world domination* and/or a coup d'état was such an implausible result, that they easily convinced themselves of their own invincibility. Despite the extent of Ms. Bostick's education, the prestige of her career, or her determined persistence as to her own success, Defendants saw her as only being define by the pigment of her skin. *See* **Exhibit T.** With that perspective, Defendants determined to make her live within the confines of a stereotype, typecasting her in accordance with what were perceived as her choices: Ms. Bostick had not adhered to pressures which would force her to succumb to group think or pander for the sake of easy entry into popular crowds and cliques *Heathers*. Defendants believed her failure to do so rendered her a target—black women like Ms. Bostick needed to be taken down a notch. In fact, Ms. Bostick's resume was Defendants motivation in their determination to reduce her to something they could present as a prized representation of what they could force accomplished African Americans to become in order to prove that no black person should ever have been elected to the high office of United States President and to prevent such an event from reoccurring in America. As a stereotypically ignorant, ghetto, welfare queen who was unaffiliated with a Greek organization or other acceptable indicator of assimilation and/or acculturation, an African-American Ms. Bostick could easily be exploited without fear of retaliation, access to intervention, or forced accountability on the part of Defendants.

99

*See id.*  So, when leaders were, in fact, advised as to Ms. Bostick's circumstances by the aforementioned programmers and suddenly announced their presence within the covert CCC technology system, Defendants doubled down in their determination to ruin Ms. Bostick and dug into their status as a modern confederacy.  Then they threatened to assassinate every living American President and refused to shut down their operations.  However, Defendants could not maintain control as they initially expected, and Plaintiffs circumstances were forcibly adjusted to enable her to complete the instant Application.

This Application does not include, nor represent "bare allegations of malice," incapable of overcoming a defense of qualified immunity, nor any other possibly available defense.  *See Britton*, 523 U.S. 574, at 588–89.  To the contrary, the conduct of the Defendant States, as well as the conduct of their co-Defendants, was improperly motivated, long-planned, targeted as to Plaintiff Ms. Bostick, and executed neither with regard for the young, African-American woman's humanity, nor her womanhood, nor the fact that she became a mother under the close examination of Defendants as they strove to effectuate their malevolent plan to prove white superiority, nor any respect for the fact that she persevered despite their attempts to derail her future, and not even with any respect for the President they claim to be constituents of who, himself recently became aware of Ms. Bostick's circumstances and was forced to lead a covert operation in partnership with President Obama in order to breach the security of the CCC technology employed.  President Trump instructed the participants to shut down any and all activity related to Ms. Bostick.  Again convinced that they could prevent this Application from ever being filed and further persuaded that they had, in fact seceded from the Union such that they no longer had to obey any American commander in chief, Defendants balked at the instruction and turned

their efforts at shutting down both President Obama's and President Trumps ability to retrieve Plaintiffs from within the State of Maryland  under the threat of assassination.  As such, this motion ensued, and Plaintiff must succeed on the merits of this case.

> 2. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Emergency Preliminary Relief.

Although Plaintiffs file this motion seeking to enjoin the Defendant States and the co-Defendants as to several matters, of greatest import is Plaintiffs request to enjoin Defendants from using of their covert CCC technological communication system at all until such time that regulations and restrictions can be put in place in order to prevent its use in order to harass, demean, molest, abuse, manipulate, enslave, berate, or otherwise hostilely, impermissibly and illegally trespass as to a person, or otherwise infringe upon their peace of mind, well-being, financial security, business activities, life, liberty, property, and/or the pursuit of their happiness.  Given the long list of acts Defendants have already engaged in with the intent to deprive Plaintiffs of their Constitutionally guaranteed rights, it is clear that, absent this Court's intervention, Plaintiffs are likely to suffer ongoing, irreparable harm.  *See Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 375–76, 555 U.S. 7, 22–24 (U.S.,2008).  Without such intervention, Ms. Bostick will be unable to meaningfully exist as a human being, a daughter, a sister, a mother, an attorney, or a citizen or otherwise and the minor child will be denied, not only his mother, but his entire childhood and quite possibly his natural-born gifts and intellect.  Although compensation is hereby requested on an immediate and emergent basis, without prohibiting Defendant from continuing communicate with her in any way, particularly by use of their covert technology system, such compensation paid will not remedy, nor pacify Plaintiffs' injuries until such

time that a hearing can be held as to the merits of this action.  *See Ramirez v. Collier*, 142 S.Ct. 1264, 1281–82 (U.S., 2022).

> 3.  <u>The Balance of Equities Significantly Tilt in Favor of Plaintiffs.</u>

In determining whether to grant a Plaintiff's request for a preliminary injunction, the Court must balance any competing claims of injury since may be affected by granting or withholding the request.  *Weinberger v. Romero-Barcelo*, 102 S.Ct. 1798, 1803, 456 U.S. 305, 312 (U.S. Puerto Rico,1982).  Here, such a balance of equities significantly weighs in favor of Plaintiffs who, by virtue of their requests, seeks to enjoin Defendants from using unauthorized, undisclosed CCC technology in order to covertly communicate with one another, as well as Plaintiff Ms. Bostick; however, as to Ms. Bostick and her minor son, they have used such communications in order to disenfranchise Plaintiffs and abridge their Constitutionally protected freedoms.  As such, Defendants inability to use such technology is not so much an injury unto them, but a public necessity which is required to prevent Defendants from engaging in any further treasonous activities.  As to Ms. Bostick, the situation and circumstances which resulted from the use of Defendants' technology has clearly injured both her and her minor son in such a way as to already be largely irreparable and will continue to cause Plaintiffs further irreparable harm if her request for an injunction is denied.  Thus, as applied to the facts articulated herein, it is clear that the balance of equities not only tilts in Plaintiffs' favor but leans heavily in support of granting their requested injunction.

> 4.  <u>Granting the Requested Injunction is in the Public Interest.</u>

Where, as here, Plaintiffs allege that actions intentionally taken by Defendants in order to abridge rights secured unto Plaintiffs by the U.S. Constitutional which "are among

the fundamental personal rights and liberties [are] secured to all persons . . . against abridgment by a state," or by any other individual or entity, a request to enjoin Defendants from continuing to engage in such action is certainly in the public interest. *See Thornhill v. State of Alabama*, 60 S.Ct. 736, 740–41, 310 U.S. 88, 95–96 (U.S. 1940). The Defendant States either recklessly, willfully, and/or treasonously instituted a hidden government policy that aimed to "diminish the effective exercise of rights so necessary to the maintenance of democratic institutions," that their actions led to a treasonous succession from the Union in an attempt to return to a disgraceful time in American history when black persons could be enslaved by white persons as chattel property. *See id.* Obviously, the American government possesses an interest in assuring that such treason does not continue and that no further public consequences ensue as a result of Defendants' perspective, intentions, or traitorous deeds which they carried out against Plaintiffs, all the while convinced that they would  never to be discovered, at least not until such time that the time was right in order that they would carry out an American coup d'état. *See Ramirez v. Collier*, 142 S.Ct. 1264, at 1281–82.

## X.   REQUESTED RELIEF

As stated above herein, thousands of participants and hundreds of persons directly responsible for the incident and its ongoing coordinated,  corroborated, and cooperated to execute a deliberate take over as to Plaintiff Ms. Bostick's entire existence, including her thoughts, ideas, plans, creative process, legal expertise and experience, networked associations, and dreams of a future where she was not daily harassed for the color of her skin, but rather safely situated within a loving home, raising her own children with a man she would one day call husband.  However, at Defendants' insistence, and as a result of their

persistence, not only is she suffering extensive abuse, harassment, racism, and colorism as a result of their covert CCC technological infiltration into her life, but she has also been denied and opportunity to marry.  Then, after having been forced by Defendants to have a child out of wedlock in order for them to "Make a Slave" in accordance with the instructions provided in the Lynch Letter, Defendants also used their CCC technology to infiltrate Ms. Bostick's minor son, thereby refusing to allow him the freedoms customarily afforded a child of his age and impeding his ability to grow and progress with his peer group to his detriment, among other debilitating actions taken against him and his mother's ability to raise him according to her religious beliefs and the traditions of her family.  As the bible instructs, a parent's job is to "[r]aise them up in the way they should go."  And furthermore, a parent is only afforded the first seven (7) years of her child's life in order to instill the skills and beliefs necessary to set him on a proper path.  Now, having only recently become aware that Defendants are, in fact human beings, rather than the spirit beings they so long purported to be, and thereafter having been thwarted by Defendants as to every attempt to complete this Application since at least June 21, 2022, Plaintiff Ms. Bostick, her minor son, and each of her businesses hereby request the following relief:

1.    Order that Plaintiffs are able to alternatively serve Defendants, by means of electronic delivery.

2.    Order Defendant Mt. Pisgah A.M.E. Church to terminate the power upon which the Covert Communication Channel operates and enjoin said Defendant from reinstating the power and/or from using Covert Communication Channels in any way, at least until further Order of the Court.

3.    Enjoin each of the named Defendants and any and all presently unidentified Defendants from using any technology which permits them access to Plaintifss on a concealed basis and/or which has not been marketed as communication technology which is generally available for use by all American citizens; and/or

4.    Enjoin the Howard County Public School System and any other conspiring Defendant, whether identified as a party hereto or not yet so identified, from having any virtual, hidden, convert, technological access to Plaintiff Ms. Bostick and/or her minor son.

5.    Enjoin the Howard County Public School System and any other conspiring Defendant, whether identified as a party hereto or not yet so identified, from using any virtual, covert or otherwise hidden technology in relation to or by and through any child whatsoever, whether enrolled as a student, enrolled in its early intervention program, identified as a homeschool student, or not so enrolled or identified.

6.    Enjoin Defendants, not limited to, but including AT&T and Apple, from illegally accessing Plaintiff Ms. Bostick's cellular telephone to manipulate data thereon and to eliminate any associated balance with it whether as to the purchase of any telephones or other telecommunication mediums or the balance of a credit card or invoice, or any other monies they claim is due from Ms. Bostick.

7.    Order Defendant Apple to cease and desist the use of all used phones returned to it by its customer base in response to its requests for the compensable return of such phones and to provide at least two (2) brand new cellular phones and two (2) brand new iPads which have a data plan included thereon, have not been made out of recycled telecommunications devises, and are not susceptible, vulnerable, or capable of being hacked by Defendants themselves, nor any other individual or entity.

8.      Order Defendants Ashton Green and the Howard County Police Department to return and hand-deliver any item stolen from Ms. Bostick's current residence to Ms. Bostick within three (3) days of issuing a Court Order, as well as any and all Defendants named as parties hereto and any and all unidentified Defendants to cooperate with that Order by returning any stolen items to the Howard County Police Department.  And further Order, the Howard County Police Department to catalogue each item to be returned according to the identity of the individual who stole the item from Ms. Bostick's residence and/or the person whose possession it was in at the time it was returned to Ms. Bostick on a rolling basis until all such items are collected and returned in accordance with the Court's Order.

9.      Order Defendants to turn over any and all communication technology in their possession or that they are aware exists within another's possession which is or can be used in order to participate in, initiate, or receive what might be defined as a telecommunication through any measures which are covert, secret, remote, hidden or otherwise concealed from any individual and/or the United States Federal Government as to their existence or use.

10.      Order the Department of Justice or other agency of equal ability and aptitude to examine Ms. Bostick's laptop computer and other electronic devices to determine any and all persons involved in hacking said device and/or any and all applications or programs present on such device which was used or could have been used to hack the device and to protect such device from future molestation and/or infiltration via such means as represent the maximum of their abilities and to provide a replacement laptop and/or other device during such time such device or devices is within their possession in order to effectuate the Court Order.

11.     Order a litigation hold whereby each of the named Defendants and any and all presently unidentified Defendants shall preserve without interference, revision, or other alteration, any and all documents, without limitation, whether printed or recorded or reproduced by a mechanical, electronic or photographic process, or written or produced by hand, including, but not limited to, agreements, communications, reports, correspondence, telegrams, memoranda, summaries or records of communications which occurred via any technological method or other means of telecommunications; telephone conversations, summaries or records of conversations or interviews, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, diaries, graphs, computer input or output, statistical or other data, notebooks, plans, drawings, sketches, maps, opinions or reports of consultants, photographs, slides, microfilm, microfiche, motion picture film, video tapes, materials that can be retrieved/printed from or by computer, electronic mail, text messages, social media postings (*e.g.* Facebook or Twitter), brochures, pamphlets, advertisements, circulars, press releases, newspapers, magazines, trade journals, drafts, letters, appointment books, calendars, desk pads, logs, minutes of meetings, invoices, entries in books of account, any marginal comments or notes appearing on any document and all other writings of whatever type or nature.

12.     Order the Department of Justice or other agency of equal ability and aptitude to investigate the facts upon which this Motion is based and to prepare and produce a report to the Court regarding the same within no more than twenty-one (21) days following the date of such Court Order.

13.     Schedule a Conference with the Court regarding this action, not to be limited to, but to include discussions regarding potential settlement options, resolutions, and/or

scheduling options as to any Court appearances which may necessarily derive from the filing of this Application, including, but not limited to a Hearing to determine money damages payable to Plaintiffs on both an emergent and status quo basis.

14.   Waive the requirement for filing a complaint until such time that an investigation can be completed, and a Conference with the Court can be held as requested in Paragraph Thirteen (13) above.

15.   Order the Department of Justice to provide Plaintiffs Ms. Bostick and her minor son with monetary support from the victim support fund it administers until such time that Defendants' obligation in providing immediate money damages can be determined and/or ordered.

16.   Stay any eviction or any other legal action filed against Plaintiff Ms. Bostick for at least ninety (90) days or otherwise until an investigation is completed and for at least sixty (60) thereafter.

17.   Stay any action presently filed in a court of law in which one of the parties to the action is represented or was represented by Plaintiff Ms. Bostick for at least one hundred and twenty (120) days following the completion of an investigation into this matter and/or issue an order *nunc pro tunc* to be filed in each such matter, requiring any final outcomes to be reversed and stayed in accordance with the relief requested in this Paragraph.

18.   Issue a Temporary Restraining Order to protect Plaintiffs from unwanted communications, undue harassment, or any other such molestation or abuse from each of the named Defendants, any and all presently unidentified Defendants, or any person presently residing in Howard County, Maryland who was involved in any of the unconstitutional actions taken against Plaintiffs thus far.

19.    Issue a Temporary Restraining Order as to all creditors seeking monies from Plaintiff Ms. Bostick.

20.    Order Credit One to immediately return Ms. Bostick's GMC to her residence, unmolested.

21.    Issue an Order requiring all utilities and other necessities to remain on and/or active without interference from any named Defendant or any and all presently unidentified Defendants, including, but not limited to, Baltimore Gas and Electric, Comcast, AT&T, and Progressive.

22.    Stay any State Bar action and/or investigation now pending against the Plaintiff Ms. Bostick for at least one hundred and twenty (120) days following the completion of an investigation into this matter and issue an order vacating any action taken against Ms. Bostick by a State Bar or any similar organization and staying any related further proceedings in accordance with the relief requested in this Paragraph.

23.    Order each of the named Defendants and any and all presently unidentified Defendants to indefinitely cease and desist all tangible or intangible products or goods, video games, gaming systems, gaming applications, computer programs, computer systems, virtual telecommunications, software, hardware, broadcasts, steams, television depictions, film renditions, musical compositions, websites, applications and other means of telecommunications which are based on, represent, or depict any story or concept which they derived as a result of their personal, professional or third-party involvement with or use of Defendants' covert CCC technology on Plaintiffs.  The Order should require any and all such programs and/or applications to immediately terminate any production-related activities, audio visual transmissions, radio transmissions, distributions, broadcasts, or

other means of generating and/or sharing such programs and/or applications and that all such persons thereby ordered to comply also provide an accounting to the Court as to the gross sales and income derived on the basis of the creation of such product within seven (7) days of the issuance of the Court's Order.

24.    Order that any prohibition on abortion and/or in relation to the governance of a woman's or a man's body be stayed pending the completion of an investigation into the matters hereby alleged.

25.    Order each of the named Defendants and any and all presently unidentified Defendants to indefinitely cease and desist all marketing campaigns, advertisements, marketing streams, products used to market tangible or intangible goods, or any program, depiction, rendition, stream, application, program, or other composition used to market or developed on the basis of marketing strategy or strategies derived as a result of their personal, professional or third-party involvement with or use of Defendants' covert CCC technology in order to infiltrate, manipulate, appropriate, or deprive Ms. Bostick or her minor son of any benefit derivable therefrom or the content of such composition itself.  The Order should require any and all such marketing campaigns and advertisements to immediately terminate any production-related activities, audio visual transmissions, radio transmissions, distributions, broadcasts, or other means of generating and/or sharing such campaigns and advertisements and that all such persons thereby ordered to comply also provide an accounting to the Court as to the gross sales and income derived on the basis of the creation of such materials within seven (7) days of the issuance of the Court's Order.

26.    Order each of the named Defendants and any and all presently unidentified Defendants to immediately turn over any and all patents and copywrites filed and/or derived

as a result of their personal, professional or third-party involvement with or use of Defendants' covert CCC technology in order to infiltrate, manipulate, appropriate, or deprive Ms. Bostick, her minor son, or any of her other family of the benefit derivable therefrom or the content of such composition itself and to cease and desist any and all activities which are conducted on the basis of such patents and copywrites.

27.    Order that any and all medical professionals or institutions, whether named as a party to this action or not yet identified, to cease and desist any studies conducted on Ms. Bostick, her minor son, and/or any of her family members and immediately produce copies of those studies which have already been completed on the bases of those persons to both the Court and Ms. Bostick, as well as all related documents to any complete or incomplete study.

28.    Enjoin Howard County, Maryland from carrying on a government and appoint interim appointees in place of Howard County government officials until such time as an investigation is completed.

29.    Enjoin Howard County, Maryland and the State of Maryland generally from operating a judicial system at least until such time that an investigation is completed which specifically considers the appropriateness, legality and/or trustworthiness of the current practices employed as a part of that system.

30.    Enjoin the State of Maryland and any other Defendant State from carrying on a government and appoint an interim government to operate in its stead until such time as an investigation is completed.

31.    Enjoin the Howard County Elections Board and the Howard County Democratic Committee from removing Plaintiff Ms. Bostick's name from the 2022 general election; from

taking any steps or bringing to fruition any attempt to appoint another individual in her stead and any election-related fines collected in association with her candidacy to be immediately reimbursed and damages paid on the bases of the wrongful collection of same.

32.    Enjoin all Greek organizations, with emphasis on those named as a Defendants hereto from engaging in any official or unofficial actions whether they are or have been carried out with the intention to deprive Plaintiffs Ms. Bostick or her minor son of any of their Constitutionally guaranteed freedoms or have been created and/or carried out historically and/or in modern day in such a way as to repeat and instill practices into its members which mimic the conditions of American slavery as to them or have been created and/or carried out to tease perspective members into becoming interested in membership with them without disclosing that members engage in actions which mimic such historic conditions or warned regarding the potential detriment which could easily derive from participation in said organization.

33.    Issue an Order requiring the Department of Justice to provide security personnel to guard the home and person of Plaintiffs Ms. Bostick, her minor son, and her other immediate family members for at least sixty (60) days and to conclude not sooner than this Court orders subsequent to the completion of an investigation into these matters.

34.    Issue an Order requiring the State of Maryland and/or Howard County, Maryland to provide funds in order that Plaintiffs are able to hire an individual to assist them with daily activities for at least sixty (60) days and to conclude not sooner than such time that this Court provides such funds are no longer required.

35.    Order any and all medical professionals who actively participated in the personal, professional or third-party involvement with or use of Defendants' covert CCC

technology in order to infiltrate, manipulate, appropriate, or deprive Ms. Bostick or her minor son to report their related activities to this Court as well as the appropriate Medical Board and to cease and desist any activities in relation to either Ms. Bostick, her minor son, or her immediate family members which affect their respective physical, mental, or emotional health, including, but not limited to, any action taken in order to prevent any prescribed medication from having the intended effect.

36.    Issue and order requiring any identified or presently unidentified Defendant to cease and desist any actions and/or the enforcement of any policies, whether governmental, corporate, or private, whether effectuated by and/or through the covert CCC technology communication system or by and/or through practical systems and/or generally accessible telecommunications devices, which operate or are intended to deprive Plaintiff Ms. Bostick, her minor son, or other immediate family members of their constitutionally guaranteed and/or afforded rights, privileges, protections and immunities.

37.    Order Defendant Ashton Green and is co-conspirators to provide funds which cover Plaintiff's relocation expenses to a new residence of her choosing and all of her living expenses for one full calendar year, such funds to be replenished until such time that this Court issues an Order terminating its obligation to do so.

38.    Order Howard County, Maryland, the State of Maryland and Howard County Public Schools to make arrangements for Plaintiff's minor son to attend a private school of her choosing and to cover the costs of his attendance at the selected private school for one full academic year, such costs to be replenished until such time that this Court issues an Order terminating the obligation to do so.

## XI.   REQUEST TO WAIVE THE REQUIREMENT FOR SECURITY

Plaintiffs seek to waive the security requirement because the facts as articulated herein are well supported, extreme, and resulted, not only in the deprivation of Plaintiffs' Constitutional rights, but also the intentional deprivation of her income and destruction of her financial stability, as well as her general welfare. *See Government Employees Insurance Company v. Zilberman*, 2021 WL 1146086, at *2–3 (E.D.N.Y., 2021).

## XII.   CONCLUSION

WHEREFORE, Plaintiffs Christina J. Bostick and C.B., a minor, hereby request that the afore requested relief be granted on an emergency basis and that a conference be scheduled with the Court as soon as possible as to settlement and/or scheduling options.[24]


Christina J. Bostick
*Pro Se* Litigant

---

[24] The table of authorities and referenced exhibits shall be filed as soon as is possible following the submission of this Application.